

**FILE**
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE AUG 1 5 2019

_Fairhurst CJ_
CHIEF JUSTICE

This opinion was
filed for record
at 8am on Aug 15, 2019

_Susan L. Carlson_
Susan L. Carlson
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 95263-9 |
| | ) | |
| Respondent, | ) | EN BANC |
| | ) | |
| v. | ) | Filed _____ AUG 1 5 2019 _____ |
| | ) | |
| ANTHONY ALLEN MORETTI, | ) | |
| | ) | |
| Petitioner. | ) | |
| | ) | |
| STATE OF WASHINGTON, | ) | No. 95510-7 |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HUNG VAN NGUYEN, | ) | |
| | ) | |
| Petitioner. | ) | |
| | ) | |
| STATE OF WASHINGTON, | ) | No. 96061-5 |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FREDERICK DEL ORR, | ) | |
| | ) | |
| Petitioner. | ) | |

FAIRHURST, C.J.—Under the Persistent Offender Accountability Act (POAA), the third time a person is convicted of a "most serious offense," they must be sentenced to life in prison without the possibility of parole. RCW 9.94A.030(38)(a), .570. This statute is colloquially known as the "three strikes and you're out" law. *State v. Thorne*, 129 Wn.2d 736, 746, 921 P.2d 514 (1996). These three cases each ask whether it is constitutional to apply the POAA to people who were in their 30s or 40s when they committed their third strike but were young adults when they committed their first strike.

We hold that it is constitutional. Article I, section 14 of the Washington Constitution does not require a categorical bar on sentences of life in prison without the possibility of parole for fully developed adult offenders who committed one of their prior strikes as young adults. We also hold that the sentences in these cases are not grossly disproportionate to the crimes.

## I.    FACTS AND PROCEDURAL HISTORY

### A.    Anthony Allen Moretti

Anthony Allen Moretti was born on April 22, 1983. When he was 20 years old, he was charged with breaking into a vacant home and setting fire to it. He pleaded guilty to arson in the first degree and was sentenced to 28 months in prison.

When he was 26 years old, he was driving while intoxicated and caused an accident in which someone was injured. He pleaded guilty to vehicular assault

causing substantial bodily harm to another while under the influence of alcohol and was sentenced to 13 months in prison.

At age 32, Moretti assaulted and robbed two men at a boat launch. One of his victims, Michael Knapp, had recently won $1,250 at a local casino. Knapp and his friend, Tyson Ball, wanted to use some of the money to buy methamphetamine. Ball arranged to meet a woman at a boat launch in order to buy the drugs, but instead of completing their purchase, Ball and Knapp were assaulted by two men, later identified as Moretti and Sam Hill. Hill assaulted Ball while Moretti beat Knapp with a bat, demanding that he give them the money. Moretti and Hill left after Knapp complied. Moretti and Hill were both later identified and arrested. Moretti proceeded to trial and was convicted of first degree robbery of Knapp and second degree assault of Ball. Because Moretti had previously been convicted of two separate most serious offenses,[1] he was labeled a "persistent offender" under RCW 9.94A.570 and was given the mandatory sentence of life in prison without the possibility of parole.

Moretti appealed, arguing, among other things, that his mandatory life without parole sentence was a violation of article I, section 14 of our constitution and the Eighth Amendment to the United States Constitution. He claimed that this sentence was cruel because the judge was not permitted to consider his youth at the time of

---

[1] All of the petitioners have criminal histories beyond the strike offenses. However, each defendant was sentenced to life in prison without the possibility of parole based solely on the fact that these strike offenses qualified them as persistent offenders.

his prior strike offenses. Division Two of the Court of Appeals, by a majority, affirmed on this issue. *State v. Moretti*, No. 47868-4-II, slip op. at 19 (Wash. Ct. App. Oct. 31, 2017) (unpublished), https://www.courts.wa.gov/opinions/pdf/ D2%2047868-4-II%20Unpublished%20Opinion.pdf.

B.     Hung Van Nguyen

Hung Van Nguyen was born on July 30, 1973. He grew up in Vietnam and moved to the United States in 1990. He did not receive any formal education in Vietnam or in the United States. Psychological evaluations have suggested that he may suffer from some cognitive difficulties. When he was 20 years old, he was convicted of first degree burglary and was sentenced to 18 months in prison. The facts underlying the burglary are not in the record.

When he was 39 years old, Nguyen pleaded guilty to second degree assault by strangulation after he put his hands around his sister's throat during an argument, in front of her 6 year old son. He was sentenced to 17 months in prison. He does not argue that he was a young adult when he committed this strike.

At age 41, Nguyen was staying with his friend Thu Nguyen.[2] She had asked him to leave more than once, but he refused. She called the police repeatedly over the course of 10 days in order to force him to leave, but the police were not helpful,

_____

[2] Thu Nguyen is not related to Hung Van Nguyen. To avoid confusion, we will use her full name when referring to her.

4

so she eventually locked him outside while he was speaking to police officers. The next day, Thu Nguyen was taking a nap with her 4 year old grandson. She woke up to Nguyen walking out of her bedroom closet, holding a knife. He told her that he was going to kill her and then stabbed her 10 times, repeatedly catching her as she tried to escape. At that moment, Thu Nguyen's friend Linh Truong arrived for a visit. Truong knocked on the door, and Thu Nguyen's grandson opened the door to let her in. Truong saw Nguyen on top of Thu Nguyen and threw a chair at him to get him off her. The chair missed, but Nguyen turned and stabbed Truong, giving Thu Nguyen the chance to escape. Both victims were able to make it outside, and Truong called 911. Nguyen was arrested and was found competent to stand trial after a psychological evaluation. The jury convicted him of first and second degree assault, both while armed with a deadly weapon.

Because Nguyen had previously been convicted of two separate most serious offenses, he was labeled a "persistent offender" under RCW 9.94A.570 and was given the mandatory sentence of life in prison without the possibility of parole. Nguyen appealed, and Division One of the Court of Appeals affirmed his sentence. *State v. Hung Van Nguyen*, No. 74962-5-I, slip op. at 7-8 (Wash. Ct. App. Jan. 16, 2018) (unpublished), https://www.courts.wa.gov/opinions/pdf/749625.pdf.

C.    Frederick Del Orr

Frederick Del Orr was born on April 8, 1974. When he was 19 years old, a police report alleges that he approached a one-legged man in downtown Spokane and demanded money. The man gave him $6 in cash and some change. Orr became angry at the low amount and demanded the man's bank card. The man refused. Orr struck him in the face with a broken beer bottle, grabbed the crutch that the man used to walk, struck him again, and then left. Orr did not remember committing the crime, but he entered an *Alford*[3] plea of guilty to second degree of robbery and was sentenced to 6 months in the county jail.

When he was 21 years old, Orr was charged with first degree robbery. The statement of probable cause alleges that he was drinking beer at a man's apartment when he started acting strangely and was asked to leave. Orr hit the man, and the man hit him back. Orr then grabbed a paring knife and threatened to kill the man and his roommate before eventually leaving with the man's Toshiba portable stereo. The man tried to stop him from taking the stereo, but Orr raised the knife and chased him down the hallway. Orr entered an *Alford* plea of guilty to first degree robbery and was sentenced to 50 months in prison.

At age 41, Orr was living on the streets of Spokane. An acquaintance had allegedly told him that a man named Sasquatch was holding children against their

---

[3] *North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

will at a house in the area and was sexually abusing them. Orr was abused as a child himself and had heard sex offenders discuss their abuse of children while he was in prison. He became deeply upset and decided to investigate. He went to the house in question carrying a large metal pipe. He investigated and eventually decided to break in. The owner of the house was inside with her 2 year old child. She saw Orr searching around. When he saw her, he left the house and sat down on the porch. Meanwhile, a neighbor had seen what had happened and went to confront Orr. The neighbor had a gun. An argument ensued, and Orr swung the pipe at the neighbor's head several times, telling the neighbor to shoot him. Orr eventually acknowledged that he had the wrong house and dropped the metal pipe. He was arrested and was later convicted of first degree burglary and second degree assault, both with a deadly weapon.

Because Orr had previously been convicted of two separate most serious offenses, he was labeled a "persistent offender" under RCW 9.94A.570 and was given the mandatory sentence of life in prison without the possibility of parole. Orr appealed, and Division Three of the Court of Appeals affirmed his sentence. *State v. Orr*, No. 34729-0-III, slip op. at 9-10 (Wash. Ct. App. Apr. 26, 2018) (unpublished), https://www.courts.wa.gov/opinions/pdf/347290_unp.pdf.

Moretti, Nguyen, and Orr each sought review of the constitutionality of their sentences in this court. We accepted review and consolidated these cases.

7

## II.    ANALYSIS

We have repeatedly upheld sentences of life in prison without the possibility of parole for adults who commit a third most serious offense after having been convicted of most serious offenses on two separate prior occasions. We now hold that it is not categorically cruel under article I, section 14 of the Washington Constitution to impose mandatory sentences of life without the possibility of parole under the POAA on adult offenders who committed one of their prior most serious offenses as young adults. The petitioners in these cases have not shown a national consensus against this sentencing practice, and in our own independent judgment, the concerns applicable to sentencing juveniles do not apply to adults who continue to reoffend after their brains have fully developed. Because we have previously held that article I, section 14 offers more protection than the federal constitution in the context of sentencing both recidivists and juveniles, we do not address the petitioners' argument that this punishment is cruel and unusual under the Eighth Amendment to the United States Constitution.

We also hold that the sentences in these cases are not grossly disproportionate to the offenses under the four *Fain* factors: "(1) the nature of the offense; (2) the legislative purpose behind the habitual criminal statute; (3) the punishment defendant would have received in other jurisdictions for the same offense; and (4)

the punishment meted out for other offenses in the same jurisdiction." *State v. Fain*, 94 Wn.2d 387, 397, 617 P.2d 720 (1980).

## A. History of the POAA

In 1993, 76 percent of the voters in Washington State approved the passage of the POAA. Under the POAA, "persistent offenders" must be sentenced to life in prison without the possibility of parole. RCW 9.94A.570. A "persistent offender" is a person who commits a third most serious offense after having been convicted on two separate prior occasions of most serious offenses or their out-of-state equivalents. RCW 9.94A.030(38). "Most serious offense" means any class A felony or certain class B felonies that are violent, sexual, or dangerous.[4] *See* RCW 9.94A.030(33). The age of majority in Washington State is 18 years old, RCW 26.28.010, and juvenile adjudications are not included as strikes under the POAA. *Thorne*, 129 Wn.2d at 748; RCW 9.94A.030(35).

We have continually upheld sentences imposed under the POAA as constitutional and not cruel under article I, section 14. *See, e.g., State v. Witherspoon*, 180 Wn.2d 875, 889, 329 P.3d 888 (2014); *State v. Magers*, 164 Wn.2d 174, 193,

---

[4] At the time these defendants committed the instant offenses, "most serious offenses" included, among other crimes, all class A felonies; assault in the second degree; robbery in the second degree; vehicular assault, when caused by the operation or driving of a vehicle by a person while under the influence of intoxicating liquor or any drug; and any felony with a deadly weapon verdict. RCW 9.94A.030(33). The legislature recently removed robbery in the second degree from the list of most serious offenses. ENGROSSED SUBSTITUTE S.B. 5288, 66th Leg., Reg. Sess. (Wash. 2019). Language making this change retroactive was removed by amendment. Amend. 5288-S AMS PADD S2657.1 to ENGROSSED SUBSTITUTE S.B. 5288.

189 P.3d 126 (2008) (plurality opinion); *State v. Manussier*, 129 Wn.2d 652, 667, 921 P.2d 473 (1996); *State v. Rivers*, 129 Wn.2d 697, 715, 921 P.2d 495 (1996); *Thorne*, 129 Wn.2d at 772-73; *see also State v. Davis*, 133 Wn.2d 187, 190, 943 P.2d 283 (1997) (agreeing that the offenders' crimes are not distinguishable from *Manussier*, *Rivers*, and *Thorne* and, therefore, that a challenge arguing that the sentences were cruel would be frivolous).

B.     Sentencing an older adult recidivist who committed a prior crime as a young adult to life in prison without parole is not categorically unconstitutional

Moretti, Nguyen, and Orr each challenge their POAA sentences, claiming that imposing a mandatory sentence of life without the possibility of parole on a person who committed at least one, but not all, of their strike offenses as a young adult categorically violates article I, section 14 of the Washington Constitution and the Eighth Amendment to the United States Constitution. We have previously held that article I, section 14 is more protective than the Eighth Amendment when evaluating both the proportionality of the POAA, *Witherspoon*, 180 Wn.2d at 887, and juvenile sentencing, *State v. Bassett*, 192 Wn.2d 67, 82, 428 P.3d 343 (2018). Therefore, if it is not cruel under article I, section 14 to apply the POAA to offenders who committed a prior strike offense as a young adult, then it is necessarily not cruel and unusual under the Eighth Amendment. "We review a statute's constitutionality, like questions of law, de novo." *Id.* at 77.

10

1.  *There is no evidence of a national consensus against using a crime committed as a young adult to enhance the sentence of an adult who continues to offend*

"The first step in the categorical bar analysis is to determine whether there is a national consensus against" the sentencing practice at issue. *Id.* at 85. To determine this, we consider "'objective indicia of society's standards, as expressed in legislative enactments and state practice.'" *Id.* (internal quotation marks omitted) (quoting *Graham v. Florida*, 560 U.S. 48, 61, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010)). "'It is not so much the number of these States that is significant, but the consistency of the direction of change.'" *Id.* at 86 (quoting *Atkins v. Virginia*, 536 U.S. 304, 315, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002)). The United States Supreme Court has stated that the burden is on the offender to show that a national consensus exists. *See Stanford v. Kentucky*, 492 U.S. 361, 373, 109 S. Ct. 2969, 106 L. Ed. 2d 306 (1989), *overruled on other grounds by Roper v. Simmons*, 543 U.S. 551, 574, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005); *cf. Bassett*, 192 Wn.2d at 86 (explaining that the offender was "correct" that the direction of change was in his favor).

None of the petitioners have provided information about whether other states allow the use of a crime committed as a young adult to enhance a sentence imposed on an offender who commits a third strike as an older adult. In his amended supplemental brief, Nguyen argues that "states overwhelmingly prohibit the use of

*juvenile* offenses to drastically enhance later sentences under recidivist schemes." Am. Suppl. Br. of Pet'r Nguyen at 9 (emphasis added). But the POAA already prohibits counting a juvenile adjudication as a strike offense. RCW 9.94A.030(35).[5]

A review of the case law shows that many state courts have held that when sentencing an adult recidivist, it is not cruel and unusual to consider strike offenses committed when the offender was not just a young adult, but a juvenile. *See, e.g.,* *Counts v. State*, 2014 WY 151, 338 P.3d 902 (holding that it was constitutional to sentence an adult to life in prison as a habitual offender even though one of his prior qualifying felony convictions was committed at age 16); *State v. Green*, 412 S.C. 65, 85-87, 770 S.E.2d 424 (Ct. App. 2015) (holding that it was constitutional to impose a life without parole sentence on adult recidivist whose prior strike was committed at age 17). Similarly, federal courts have routinely found that it does not violate the Eighth Amendment to impose mandatory minimum sentences on adult recidivists whose prior crimes were committed not just as young adults, but as juveniles. *See, e.g.,* *United States v. Hoffman*, 710 F.3d 1228, 1233 (11th Cir. 2013) ("Nothing in *Miller*[6] suggests that an adult offender who has committed prior crimes as a juvenile should not receive a mandatory life sentence as an adult, after

---

[5] We express no opinion on whether it is constitutional to apply the POAA to an offender who committed a strike offense as a juvenile and was convicted in adult court.

[6] *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012) (holding that it is unconstitutional to sentence a juvenile to life in prison without the possibility of parole without an individualized determination of their culpability in light of their youth).

committing a further crime as an adult." (emphasis omitted)); *United States v. Scott*, 610 F.3d 1009, 1018 (8th Cir. 2010) ("Scott was twenty-five years old at the time he committed the conspiracy offense in this case [and was sentenced to a mandatory term of life without parole]. . . . The [Supreme] Court in *Graham* did not call into question the constitutionality of using prior convictions, juvenile or otherwise, to enhance the sentence of a convicted adult."); *United States v. Mays*, 466 F.3d 335, 340 (5th Cir. 2006) (affirming a mandatory sentence of life without parole imposed on an adult recidivist who committed his first strike offense at age 17 and explaining that "[t]here is not a national consensus that a sentencing enhancement to life imprisonment based, in part, upon a juvenile conviction contravenes modern standards of decency").

We see no evidence of a national consensus against applying recidivist statutes to adults who committed prior strike offenses as young adults. This step of the inquiry weighs against a categorical bar. But "[c]ommunity consensus, while 'entitled to great weight,' is not itself determinative of whether a punishment is cruel." *Graham*, 560 U.S. at 67 (quoting *Kennedy v. Louisiana*, 554 U.S. 407, 434, 128 S. Ct. 2641, 171 L. Ed. 2d 525 (2008)).

2. *Independent judgment shows that the concerns raised by our new understanding of adolescent brain development are not present here*

The second step in the categorical bar analysis requires us to exercise our independent judgment. *Bassett*, 192 Wn.2d at 87. We consider "'the culpability of

13

the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question'" and "'whether the challenged sentencing practice serves legitimate penological goals.'" *Id.* (quoting *Graham*, 560 U.S. at 67).

a.     There has been no showing of reduced culpability here

First, we must assess the culpability of these petitioners in light of their crimes and characteristics. We now understand that "children are less criminally culpable than adults." *Id.* Petitioners rely on cases and "psychological and neurological studies showing that the 'parts of the brain involved in behavior control' continue to develop well into a person's 20s" to argue that they are less culpable than other POAA offenders. *State v. O'Dell*, 183 Wn.2d 680, 691-92, 358 P.3d 359 (2015) (footnote omitted) (quoting *Miller*, 567 U.S. at 472); *see also MIT Young Adult Development Project: Brain Changes*, MASS. INST. OF TECH., https://hr.mit.edu/static/worklife/youngadult/brain.html [https://perma.cc/C9B8-MWDU] ("The brain isn't fully mature at ... 18, when we are allowed to vote, or at 21, when we are allowed to drink, but closer to 25, when we are allowed to rent a car."). "These studies reveal fundamental differences between adolescent and mature brains in the areas of risk and consequence assessment, impulse control, tendency toward antisocial behaviors, and susceptibility to peer pressure." *O'Dell*, 183 Wn.2d at 692 (footnotes omitted). The United States Supreme Court has relied on this science to hold that "[b]ecause juveniles have diminished culpability and

greater prospects for reform, . . . 'they are less deserving of the most severe punishments.'" *Miller*, 567 U.S. at 471 (quoting *Graham*, 560 U.S. at 68).

It is true that our new understanding of juvenile brains "establish[es] a clear connection between youth and decreased moral culpability for criminal conduct." *O'Dell*, 183 Wn.2d at 695. And in *O'Dell*, we recognized that "age may well mitigate a defendant's culpability, even if that defendant is over the age of 18." *Id.* But "age is not a per se mitigating factor automatically entitling every youthful defendant to an exceptional sentence." *Id.* Instead, we held that trial courts are statutorily allowed to consider evidence that a "youth in fact diminished [the young adult] defendant's culpability." *Id.* at 689. Moretti, Nguyen, and Orr have not produced any evidence that their youth contributed to the commission of the instant offenses, or even that youth contributed to their prior offenses. They have not suggested that the brains of 32 or 41 year old men are not fully mature. Nothing in this record suggests that they are any less culpable than any other adult offender.

Many of the cases exempting juveniles from harsh sentencing practices have relied on the strong prospects of juveniles for change.[7] For example, in *Bassett*, we

---

[7] Just as risk taking peaks during adolescence, studies that have been conducted in different historical epochs and in countries around the world have found that crime engagement peaks at about age seventeen (slightly younger for nonviolent crimes and slightly older for violent ones), and declines significantly thereafter. Longitudinal studies have shown that the majority of adolescents who commit crime desist as they mature into adulthood. Only a small percentage—generally between five and ten percent—become chronic offenders or continue offending during adulthood.

explained that a life without parole sentence is inappropriate for juveniles in part because it means that "'good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the child], he will remain in prison for the rest of his days.'" 192 Wn.2d at 88 (alteration in original) (internal quotation marks omitted) (quoting *Graham*, 560 U.S. at 70). In *Bassett*, we also noted that a life without parole sentence "is 'especially harsh' for children, who will 'on average serve more years and a greater percentage of [their] li[ves] in prison than an adult offender." *Id.* (alterations in original) (quoting *Graham*, 560 U.S. at 70). This is not the case here. These petitioners are fully developed adults who were repeatedly given opportunities to prove they could change. Moretti, Nguyen, and Orr each committed a most serious offense, were sentenced and released, then committed another most serious offense, were sentenced and released, and then chose to commit yet another most serious offense.[8] It was their decisions to commit their third most serious offenses that triggered the

---

Elizabeth Cauffman et al., *How Developmental Science Influences Juvenile Justice Reform*, 8 UC IRVINE L. REV. 21, 26 (2018) (footnotes omitted). The petitioners have proved that they are part of this rare group of chronic offenders.

[8] In reality, the petitioners had more than two chances to show that they were reformed. Moretti was convicted of and sentenced for five other felony offenses and several other misdemeanors before committing his third strike offense. Nguyen was convicted of a host of misdemeanor offenses over a 20 year period, including domestic violence assault, before he committed his third strike offense. After committing his first two strike offenses, Orr pleaded guilty to unlawful possession of a firearm, assault in the third degree, two counts of residential burglary, and harassment. He was sentenced to 20 years and committed his third strike offense 15 months after he was released.

mandatory sentences of life without the possibility of parole. The POAA gives offenders a chance to show that they can be reformed, but the petitioners failed to do so.

The petitioners' argument depends on the assumption that these sentences punish them for crimes they committed as young adults. But these sentences are for the most serious offenses they committed at either age 32 (Moretti) or age 41 (Nguyen and Orr), well into adulthood. These POAA sentences are not punishment for the crimes the petitioners committed as young adults because recidivist statutes do not impose "cumulative punishment for prior crimes. The repetition of criminal conduct aggravates the guilt of the last conviction and justifies a heavier penalty for the crime." *State v. Lee*, 87 Wn.2d 932, 937, 558 P.2d 236 (1976); *see also State v. Le Pitre*, 54 Wash. 166, 168, 103 P. 27 (1909) (The habitual criminal statute did not "inflict a cruel or unusual punishment, or impose a penalty for crimes committed outside of the state. It merely provide[d] an increased punishment for the last offense."). The United States Supreme Court has explained that

> an offense committed by a repeat offender is often thought to reflect greater culpability and thus to merit greater punishment. Similarly, a second or subsequent offense is often regarded as more serious because it portends greater future danger and therefore warrants an increased sentence for purposes of deterrence and incapacitation.

17

*United States v. Rodriquez*, 553 U.S. 377, 385, 128 S. Ct. 1783, 170 L. Ed. 2d 719 (2008). "[The] state is justified in punishing a recidivist more severely than it punishes a first offender." *Thorne*, 129 Wn.2d at 772.

Because the petitioners have made no showing that the factors that lessen the culpability of juveniles apply to offenders well into adulthood, they have not shown that they are less culpable than any other POAA offender.

    b.  The goals of punishment justify this sentence

The next question is "whether the penological goals of retribution, deterrence, incapacitation, and rehabilitation are served by this sentence." *Bassett*, 192 Wn.2d at 88. A sentence of life without the possibility of parole will never serve the goal of rehabilitation because sentencing someone to spend the rest of their life in prison "'forswears altogether the rehabilitative ideal.'" *Id.* (internal quotation marks omitted) (quoting *Miller*, 567 U.S. at 473). However, these sentences do serve the other goals of punishment.

In *Bassett*, we recognized that "the case for retribution is weakened for children because "'[t]he heart of the retribution rationale" relates to an offender's blameworthiness' and children have diminished culpability." *Id.* (alteration in original) (quoting *Miller*, 567 U.S. at 472 (quoting *Graham*, 560 U.S. at 71-74)). But these petitioners were each well into adulthood when they committed the instant offenses. They have not shown that they are less blameworthy than other adults for

18

these choices. It is true that the case for retribution against the petitioners is less strong than, for example, someone who committed multiple aggravated murders. But each of the crimes before us did involve violence or attempted violence. The people of Washington are entitled to condemn adults who chose to commit serious crimes after having twice been given a chance to reform themselves. Retribution may not be sufficient to support the sentences in and of itself, but it does not detract from their constitutionality. *Cf. Graham*, 560 U.S. at 71 ("Society is entitled to impose severe sanctions on a juvenile nonhomicide offender to express its condemnation of the crime and to seek restoration of the moral imbalance caused by the offense.").

The main purposes of the POAA are "'deterrence of criminals who commit three "most serious offenses" and the segregation of those criminals from the rest of society.'" *Witherspoon*, 180 Wn.2d at 888 (quoting *Rivers*, 129 Wn.2d at 712); *Thorne*, 129 Wn.2d at 775; *cf. Ewing v. California*, 538 U.S. 11, 29, 123 S. Ct. 1179, 155 L. Ed. 2d 108 (2003) (plurality opinion) (finding that these are goals of recidivist statutes in general); *Rummel v. Estelle*, 445 U.S. 263, 284, 100 S. Ct. 1133, 63 L. Ed. 2d 382 (1980) (same). In *Bassett*, we explained that deterrence cannot justify life without parole sentences for juveniles because "'the same characteristics that render juveniles less culpable than adults—their immaturity, recklessness, and impetuosity—make them less likely to consider potential punishment.'" 192 Wn.2d at 88 (internal quotation marks omitted) (quoting *Miller*, 567 U.S. at 472). But,

19

again, the petitioners have made no showing that their youth at the time of their prior offenses made them less culpable than a typical POAA offender. The POAA makes it clear that every offender who commits a third most serious offense will be sentenced to life in prison without the possibility of parole. Each of these petitioners had been imprisoned twice before for committing most serious offenses. There is no evidence before us that adults in their 30s or 40s are less likely than any other adult to consider the consequences of choosing to reoffend.

Incapacitation is a particularly strong justification in this context. As the United States Supreme Court has recognized, "[r]ecidivism is a serious risk to public safety, and so incapacitation is an important goal." *Graham*, 560 U.S. at 72. In passing the POAA, the voters explained, "Community protection from persistent offenders is a priority," and by passing this law, "the people intend[ed] to . . . [i]mprove public safety." RCW 9.94A.555.

In *Bassett*, we explained that incapacitation could not justify sentencing a juvenile to life in prison without the possibility of parole because this "sentence 'makes an irrevocable judgment about that person[ ]' that is at odds with what we know about children's capacity for change." 192 Wn.2d at 89 (alteration in original) (quoting *Graham*, 560 U.S. at 74). We noted that "children have 'diminished culpability and heightened capacity for change.'" *Id.* (internal quotation marks omitted) (quoting *State v. Ramos*, 187 Wn.2d 420, 444, 387 P.3d 650 (2017)).

Similarly, in *Miller*, the Supreme Court held that "[d]eciding that a 'juvenile offender forever will be a danger to society' would require 'mak[ing] a judgment that [he] is incorrigible'—but 'incorrigibility is inconsistent with youth.'" 567 U.S. at 472-73 (second and third alterations in original) (internal quotation marks omitted) (quoting *Graham* 560 U.S. at 72-73); *see also Montgomery v. Louisiana*, __ U.S. __, 136 S. Ct. 718, 733, 193 L. Ed. 2d 599 (2016) ("The need for incapacitation is lessened, too, because ordinary adolescent development diminishes the likelihood that a juvenile offender 'forever will be a danger to society.'" (internal quotation marks omitted) (quoting *Miller*, 567 U.S. at 472)). *Montgomery* clarified that life without the possibility of parole was an unconstitutional sentence for all juvenile offenders "whose crimes reflect the transient immaturity of youth." 136 S. Ct. at 734. These judgments relied on the principle that most juveniles are capable of change and will not continue to recidivate into adulthood. As we noted in *Bassett*, "'It is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.'" 192 Wn.2d at 89 (quoting *Roper*, 543 U.S. at 573).

But the petitioners are neither juveniles nor young adults. We do not have to guess whether they will continue committing crimes into adulthood because they already have. Moretti was the youngest of the petitioners when he chose to commit

21

his third most serious offense, but even he was 32 years old. This is well past the age when courts have recognized that youth may mitigate criminal culpability. *See O'Dell*, 183 Wn.2d at 692 n.5 (citing reports that the brain may not fully mature until age 25). Because Moretti, Nguyen, and Orr each committed their third most serious offense as adults in their 30s and 40s, they have shown that they are part of this rare group of offenders who are "simply unable to bring [their] conduct within the social norms prescribed by the criminal law." *Rummel*, 445 U.S. at 284. It was rational for the people to decide that offenders like the petitioners must be incarcerated in order to protect the public.

Regardless of any personal opinions as to the wisdom of this statute, we have "long deferred to the legislative judgment that repeat offenders may face an enhanced penalty because of their recidivism." *Fain*, 94 Wn.2d at 390-91, 402 (explaining that a challenge to the constitutionality of the habitual criminal statute would have failed based on this deference because "we must and do defer to the legislative decision to impose an enhanced penalty on recidivists"). The petitioners have failed to establish a national consensus against the sentencing practice at issue here and our own independent judgment confirms that these sentences are supported by legitimate penological goals. We hold that article I, section 14 does not categorically prohibit imposing a life without parole sentence on a fully developed adult offender who committed one of their prior strike offenses as a young adult.

C.     These sentences are proportional under the *Fain* factors

A sentence may also be cruel under article I, section 14 if it is grossly disproportionate to the offense. When conducting a proportionality analysis, we consider "'(1) the nature of the offense, (2) the legislative purpose behind the statute, (3) the punishment the defendant would have received in other jurisdictions, and (4) the punishment meted out for other offenses in the same jurisdiction.'" *Witherspoon*, 180 Wn.2d at 887 (quoting *Rivers*, 129 Wn.2d at 713 (citing *Fain*, 94 Wn.2d at 397)). Under the *Fain* factors, these sentences are not grossly disproportionate to the offenses.

The first factor is the nature of the offense. Moretti was convicted of first degree robbery and second degree assault; Nguyen was convicted of first and second degree assault with a deadly weapon; and Orr was convicted of first degree burglary and second degree assault, both with a deadly weapon. Each of the petitioners was convicted of two most serious offenses, one of which was a class A felony. Under RCW 9A.20.021, class A felonies are punishable by a maximum of life in prison even for people who are not persistent offenders.[9]

---

[9] If Moretti had not been a persistent offender, his standard range sentence for his class A first degree robbery conviction would have been 129-171 months, or approximately 11 to 14 years. RCW 9.94A.510. If Nguyen had not been a persistent offender, his standard range sentence for his class A first degree assault conviction would have been 178-236 months with a 24 month enhancement for using a deadly weapon, and a 12 month deadly weapon enhancement for his class B second degree assault conviction would have had to run consecutively to any sentence, resulting in a standard range of approximately 16 to 21 years. *Id.* If Orr had not been a persistent offender, his standard range sentence for his class A first degree burglary conviction would have been 87-

The instant offenses were serious, violent crimes. Moretti beat a man with a bat in order to rob him, breaking the bat against the victim's arms as he struggled to defend himself. Moretti and his companion also attacked a second man, splitting open his forehead, the back of his head, and his ear. Nguyen told Thu Nguyen that he was going to kill her and then stabbed her 10 times in front of her four year old grandson. His knife penetrated and partially broke her skull, narrowly missing her brain. His victim only escaped because a friend stopped by the house and was able to intervene, but the friend did not escape unscathed. Nguyen stabbed her in the side when she attempted to rescue Thu Nguyen. Orr's crime was the least violent, but he too assaulted another person. Orr broke into a woman's house while she was there with her child, intending to beat up a man who he had heard was inside, and then swung a large metal pipe at the head of a neighbor several times. These crimes are each more violent than those that we held supported a POAA sentence in *Witherspoon*, 180 Wn.2d at 888, and in *Rivers*, 129 Wn.2d at 713. Each offender here either injured another person or attempted to do so. These crimes are therefore "far more serious offense[s] than the second degree theft" found to be disproportionate in *Fain. Id.*

---

116 months with a 24 month enhancement for using a deadly weapon, and a 12 month deadly weapon enhancement for his class B second degree assault conviction would have had to run consecutively to any sentence, resulting in a standard range sentence of approximately 10 to 13 years. *Id.*

24

As the State recognized in oral argument, this factor demands consideration of not only the nature of the crime but also the culpability of the offender who committed it. The petitioners in these cases argue that their sentences are disproportionate because they were either 19 or 20 years old when they committed their first strike offense and their relative youth therefore made them less culpable.[10] But our proportionality review focuses on the nature of the current offense, not the nature of past offenses. Moretti was 32 when he committed the instant offense, and both Nguyen and Orr were 41. None of the petitioners have shown that their culpability was reduced when they committed the instant offenses. Far from showing that "as the years go by . . . [their] 'deficiencies will be reformed,'" the petitioners have continued to recidivate after their brains were fully developed and have shown "'entrenched patterns of problem behavior.'" *Miller*, 567 U.S. at 472-73, 471 (internal quotation marks omitted) (quoting *Graham*, 560 U.S. at 68; *Roper*, 543 U.S. at 570). This factor indicates that these sentences are not grossly disproportionate.

---

[10] Nguyen also argues that his sentence is disproportionate because of his "possible intellectual disability," Am. Suppl. Br. of Pet'r Nguyen at 17, but this claim is not supported by the record. Although there was previously a suggestion that he may have a mild intellectual disability, his most recent forensic mental health evaluation reported that he seemed to be pretending to be unable to remember details about the charges against him and found that this was "not a function of impaired memory, cognitive impairment, or underlying mood or thought disorder." Nguyen Clerk's Papers at 31.

The second factor is the legislative purpose of the statute. We have previously recognized that the purpose of the POAA is to deter criminals who commit three most serious offenses and to incapacitate them by segregating them from the rest of society. *See Thorne*, 129 Wn.2d at 774-75. As discussed above, *supra*, Section B.2.b, these goals are served by these sentences. Moretti, Nguyen, and Orr all committed dangerous felonies time and time again. They have shown that they are unwilling to stop endangering the public. This factor also suggests that these sentences are not grossly disproportionate.

The third factor is the punishment that the offenders would have received in other jurisdictions. The petitioners did not address this factor in their briefing. According to the State's brief from Spokane County, it appears as though 13 other states impose mandatory sentences of life without parole on offenders who continue to recidivate.[11] Am. Suppl. Br. of Resp't, Attach. A. A total of 34 states appear to have some sort of habitual offender statute, many of which allow or require imposing

---

[11] These states are Alabama (ALA. CODE § 13A-5-9(c)(4)), California (CAL. PENAL CODE § 667.7(a)(2)), Delaware (DEL. CODE ANN. tit. 11, § 4214(d), (e)), Georgia (GA. CODE ANN. § 17-10-7(b)(2)), Louisiana (LA. REV. STAT. ANN. § 15:529.1A(3)(b)), Maryland (MD. CODE ANN., CRIM. LAW § 14-101), Mississippi (MISS. CODE ANN. § 99-19-83), Montana (MONT. CODE ANN. § 46-18-219), North Carolina (N.C. GEN. STAT. ANN. § 14-7.12), South Carolina (S.C. CODE ANN. § 17-25-45), Tennessee (TENN. CODE ANN. § 40-35-120(g)), Virginia (VA. CODE. ANN. § 19.2-297.1), and Wisconsin (WIS. STAT. ANN. § 939.62(2m)(c)). Alabama, California, and Maryland only impose life without parole after the fourth qualifying offense, while Georgia, Montana, and South Carolina impose this sentence after the second qualifying offense for particularly egregious crimes. Hawaii, West Virginia, Pennsylvania, and the District of Columbia will also impose this sentence in certain circumstances. HAW. REV. STAT. ANN. §§ 706-661, -662; W. VA. CODE ANN. § 61-11-18; 42 PA. CONS. STAT. ANN. § 9714(a); D.C. CODE § 22-1804a.

life sentences. *Id.* Because each state has a different threshold for what qualifies as a strike offense, it is unclear exactly how each of the petitioners would have fared in other jurisdictions. But even if they would have received shorter sentences in some other jurisdictions, "this factor alone is not dispositive." *Witherspoon*, 180 Wn.2d at 888.

The fourth and final *Fain* factor is the punishment the offenders would have received for a different crime in the same jurisdiction. Mandatory life in prison without the possibility of parole is the harshest sentence currently available in Washington. *See State v. Gregory*, 192 Wn.2d 1, 5, 427 P.3d 621 (2018) (plurality opinion) (abolishing the death penalty as currently applied). But, "[i]n Washington, all adult offenders convicted of three 'most serious offenses' are sentenced to life in prison without the possibility of release under the POAA." *Witherspoon*, 180 Wn.2d at 888. These petitioners would have received the same sentence if they had committed any other most serious offenses. This final factor supports the constitutionality of these sentences.

Therefore, these sentences are not grossly disproportionate to the offenses.

### III. CONCLUSION

Petitioners argued that sentencing adult offenders to mandatory sentences of life without the possibility of parole under the POAA when one of their prior strike offenses was committed as young adults is either cruel, in violation of article I,

27

section 14 of the Washington Constitution, or cruel and unusual, in violation of the Eighth Amendment to the United States constitution. We hold that it is not.

The petitioners have not shown a national consensus against this sentencing practice, and our own independent judgment confirms that there is nothing to suggest that these petitioners are less culpable than other POAA offenders. The sentences in these cases do not categorically violate the Washington Constitution. Because our constitution is more protective than the federal constitution in this context, we need not analyze this question under the Eighth Amendment. Finally, we hold that these sentences are not grossly disproportionate to the offenses under the *Fain* factors.

We affirm the Court of Appeals.

*State v. Moretti*, No. 95263-9

Fairhurst, C.J.

WE CONCUR:

Johnson, J.

Wiggins, J.

Madsen, J.

Owens, J.

Gordon McCloud, J.

Stephens, J.

29

No. 95263-9

YU, J. (concurring) — This case touches on the issue of sentencing individuals to life without the possibility of parole for a wide range of lower level offenses. I agree with the court's narrow holding that there is currently no categorical constitutional bar to the inclusion of an offense committed as a young adult as a predicate for purposes of the Persistent Offender Accountability Act ("Three Strikes Law"), RCW 9.94A.570. *See* majority at 2. But a punishment that may be constitutionally permissible today may not pass muster tomorrow.[1] I therefore write separately to express my growing discomfort with the routine practice of sentencing individuals to life without the possibility of parole, regardless of the offense or the age of the offender.

---

[1] Interpretation of the Eighth Amendment to the United States Constitution is not static but, instead, "'draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society.'" *Kennedy v. Louisiana*, 554 U.S. 407, 419, 128 S. Ct. 2641, 171 L. Ed. 2d 525 (2008) (alteration in original) (quoting *Trop v. Dulles*, 356 U.S. 86, 101, 78 S. Ct. 590, 2 L. Ed. 2d 630 (1958) (plurality opinion)). This holds true for article I, section 14 of our state constitution as well.

1

This court's decision in *State v. Gregory* limited the array of punishments that may be imposed for the most serious offenses by eliminating the death penalty. 192 Wn.2d 1, 427 P.3d 621 (2018) (plurality opinion). Every death sentence in this state has been commuted to the next most severe punishment available—life without the possibility of parole. *Id.* at 36. As a result, the range of offenses that require imposition of the most severe punishment the state can impose has been expanded. Persistent offenders who have committed robberies and assaults are now grouped with offenders who have committed the most violent of crimes, including aggravated murder and multiple rapes. The gradation of sentences that once existed before *Gregory* have now been condensed. As a result, a serious reexamination of our mandatory sentencing practices is required to ensure a just and proportionate sentencing scheme.

Our invalidation of the death penalty signified an effort to align this state's sentencing practices with society's expectations of a criminal justice system that is both fair and free of bias and imposes punishment that is proportional to the crime. In recent years, we have also seen challenges to the death penalty in courts all over the country, including the United States Supreme Court, which evidences the public's discomfort with the imposition of death sentences. Though a number of states still utilize the death penalty, 37 states have not performed an execution in the last five years. *States with No Recent Executions,* DEATH PENALTY INFO. CTR.

(July 8, 2019), https://deathpenaltyinfo.org/executions/executions-overview/states-with-no-recent-executions [https://perma.cc/ZY98-WYGC]. A nationwide decline in the use of the death penalty suggests that society's appreciation for the risk of error and recognition of the finality of such a sentence has become a limiting principle on the application of this most severe sentence. But the elimination of the death penalty only partially addresses these underlying concerns. In my view, our entire sentencing structure should also be reassessed.

There are similarities between the death penalty and life without parole. Justice Kennedy touched on these similarities in a case discussing the imposition of life without parole for juvenile offenders:

> The State does not execute the offender sentenced to life without parole, but the sentence alters the offender's life by a forfeiture that is irrevocable. It deprives the convict of the most basic liberties without giving hope of restoration, except perhaps by executive clemency—the remote possibility of which does not mitigate the harshness of the sentence.

*Graham v. Florida*, 560 U.S. 48, 69-70, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010). Like the death penalty, a life sentence without the possibility of parole is the deprivation of hope. It is the forfeiture of liberty for life.

Proportionality in sentencing is required by both article I, section 14 of the Washington Constitution and the Eighth Amendment to the United States Constitution. *E.g.*, *Coker v. Georgia*, 433 U.S. 584, 592, 97 S. Ct. 2861, 53 L. Ed. 2d 982 (1977); *State v. Fain*, 94 Wn.2d 387, 402, 617 P.2d 720 (1980). It is well

3

settled that our state constitution provides more protection for criminal offenders as

it prohibits the imposition of cruel punishment, whereas the Eighth Amendment

prohibits the imposition of cruel and unusual punishment. *Fain*, 94 Wn.2d at 393.

Despite this heightened protection, this court has been reluctant to hold that life

sentences without the possibility of parole are disproportionate and thus in

violation of article I, section 14. *See, e.g.*, *State v. Witherspoon*, 180 Wn.2d 875,

887-91, 329 P.3d 888 (2014); *State v. Magers*, 164 Wn.2d 174, 192-94, 189 P.3d

126 (2008) (plurality opinion); *State v. Rivers*, 129 Wn.2d 697, 712-15, 921 P.2d

495 (1996); *State v. Manussier*, 129 Wn.2d 652, 674-79, 921 P.2d 473 (1996).

The petitioners advocate for a proportionality analysis that considers the

characteristics of the offender, including relative youth and culpability, in addition

to the *Fain* factors. Although the current case law does not support this argument,

there have been significant advancements in the scientific community to suggest

that "emerging adults" should be treated as a distinct developmental stage in the

criminal justice system.[2]

---

[2] Dr. Jeffrey Arnett first coined the term "emerging adult" in 2000. SELEN SIRINGIL PERKER ET AL., COLUMBIA UNIV. JUSTICE LAB, EMERGING ADULT JUSTICE IN ILLINOIS: TOWARDS AN AGE-APPROPRIATE APPROACH 2 (2019), https://justicelab.columbia.edu/sites/default/files/content/EAJ%20in%20Illinois%20Report%20Final.pdf [https://perma.cc/TJ4C-NVYM]. Further research has concluded that persons age 18 to 25 tend to act impulsively and are more susceptible to peer pressure and emotions, but they also have a greater capacity for reform than older adults. Anjali Tsui, *How Brain Science Is Changing How Long Teens Spend in Prison*, FRONTLINE (May 2, 2017), https://www.pbs.org/wgbh/frontline/article/how-brain-science-is-changing-how-long-teens-spend-in-prison [https://perma.cc/8CAZ-AB6K]. These findings have already influenced legislation in many states—including Washington—that is geared toward

Those sentenced to life without a possibility of parole are treated as irredeemable and incapable of rehabilitation. The indefinite isolation of an individual conflicts with the prohibition on cruel punishment because removing the possibility of redemption is the definition of cruel. It may be difficult to understand how some of the most violent criminals could safely reenter society after incarceration. But even the most violent of criminals are entitled to have their constitutional rights respected. Life without parole sentences represent a "'denial of hope; it means that good behavior and character improvement are immaterial.'" *State v. Bassett*, 192 Wn.2d 67, 88, 428 P.3d 343 (2018) (internal quotation marks omitted) (quoting *Graham*, 560 U.S. at 70).

The penological goals thought to be advanced by long term incarceration are retribution, deterrence, incapacitation, and rehabilitation. As the majority notes, retribution and incapacitation may be achieved in some circumstances but deterrence and rehabilitation are not likely to be achieved by sentencing someone to life without parole. Majority at 18-19. When penological goals are not furthered by the imposition of a long term sentence such as life without parole, "'it "is nothing more than the purposeless and needless imposition of pain and

---

providing emerging adults with age-appropriate services during incarceration through the juvenile justice system. *See generally* RCW 13.04.030; *State v. Watkins*, 191 Wn.2d 530, 547-52, 423 P.3d 830 (2018) (Yu, J., dissenting); Clare Ryan, *The Law of Emerging Adults*, 97 WASH. U. L. REV. (forthcoming 2019); Stephanie Tabashneck, *"Raise the Age" Legislation: Developmentally Tailored Justice*, 32 CRIM. JUST., no. 4, 2018, at 13 (papers.ssrn.com/so13/papers.cfm?abstract_id=3336932).

suffering,'" and hence an unconstitutional punishment.'" *Gregory*, 192 Wn.2d at

24-25 (quoting *Enmund v. Florida*, 458 U.S. 782, 798, 102 S. Ct. 3368, 73 L. Ed.

2d 1140 (1982) (quoting *Coker*, 433 U.S. at 592)).

The criminal justice system is not one size fits all. Courts have been

entrusted with discretion in sentencing because our society understands that each

case is different. To assign one sentence for such a wide range of offenses is to

disregard our notions of fairness and justice. Our analysis of proportionality must

consider both the nature of the offense and the characteristics of the offender.

Courts have already shown a willingness to consider the characteristics of an

offender when it comes to age or intellectual disability. *See Miller v. Alabama*,

567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012); *Graham*, 560 U.S. 48.

However, judicial mercy should not be restricted to considerations of youthfulness

or competency. There are adults who are also deserving of leniency and an

individualized inquiry as to their level of culpability and capacity for rehabilitation.

A judge cannot measure at sentencing an individual's capacity for change. Shon

Hopwood, *Second Looks & Second Chances*, CARDOZO L. REV. (forthcoming

2019) (manuscript at 4) (https://ssrn.com/abstract=3404899); *see also* Michael M.

O'Hear, *Not Just Kid Stuff? Extending* Graham *and* Miller *to Adults*, 78 MO. L.

REV. 1087 (2013) (analyzing *Graham, Miller, Ewing,* and *Harmelin*[3] and

---

[3] *Harmelin v. Michigan*, 501 U.S. 957, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (1991).

reconciling the varying outcomes of each case based on principles of culpability, legislative deference, and aversion to certain sentencing practices).

When considering life sentences, it is also important to recognize the disparate impacts that the criminal justice system has on people of color. This necessarily results in disparate impact in the imposition of life sentences. One size fits all approaches to sentencing reveal the institutional and systemic biases of our society. *See* Amicus Curiae Br. of the Am. Civil Liberties Union of Wash. 8-11. The effects of disproportionate enforcement of criminal laws against people of color, especially African-Americans, will continue—exaggerated by laws that limit the discretion of trial judges in sentencing decisions.

We can and must avoid the imposition of a cruel punishment by providing an opportunity for release to every convicted defendant. One way to do this would be to reestablish a parole board, which was eliminated in 1981 with the passage of the Sentencing Reform Act of 1981, ch. 9.94A RCW.[4] Such a board could provide an opportunity for a confined individual to show evidence of rehabilitation and genuine transformation.

In recent years, a robust academic discussion has developed regarding the impacts that incarceration has on family, friends, and the greater community. *See,*

---

[4] The federal system has also been exploring policy options that will increase reentry for incarcerated individuals. *See, e.g.,* First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194; 28 C.F.R. § 572.40 (compassionate release under 18 U.S.C. § 4205(g)).

*e.g.*, Hopwood, *supra*. Longer sentences exacerbate these consequences while decreasing the potential for rehabilitation. *Id.* (manuscript at 8). We should not be satisfied with the status quo; permanent incarceration has neither reduced crime nor increased confidence in our criminal justice system. The principles set forth in *Gregory* compel us to ask the same questions about a life sentence without the possibility of parole. Is it fairly applied? Is there a disproportionate impact on minority populations? Are there state constitutional limitations to such a sentence? I dare say that these questions are not just academic. They also reflect our values and beliefs about punishment and our criminal justice system. We should join the national movement favoring release upon a showing of rehabilitation and inject into our sentencing practices the exercise of mercy, compassion, and the fact that we know not a person's capacity to change. As Shakespeare so eloquently put it, "And earthly power doth then show likest God's When mercy seasons justice."
WILLIAM SHAKESPEARE, THE MERCHANT OF VENICE, act 4, sc. 1.

_____
Yu, J.

González, J.

Madsen, J.

9