IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| THE STATE OF WASHINGTON, | No. 85116-1-I |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| DONALD JANEL LEGRONE, | |
| Appellant. | |

BOWMAN, J. — Donald Janel Legrone appeals his jury convictions and sentence for first degree kidnapping and second degree assault, both with domestic violence (DV) designations. Legrone argues the trial court violated his constitutional right to present a defense by excluding evidence and erred by imposing a sentence of life without the possibility of parole (LWOP) under the Persistent Offender Accountability Act of the Sentencing Reform Act of 1981 (POAA), chapter 9.94A RCW. He also makes several arguments in three statements of additional grounds for review (SAGs). We remand to the trial court to strike the $500 victim penalty assessment (VPA) from Legrone's judgment and sentence. Otherwise, we affirm.

FACTS

In September 2021, the State charged Legrone with one count of DV first degree kidnapping of his former girlfriend, Dorin Rankin Cerbillo, one count of DV

second degree assault of Rankin,[1] and one count of theft of Rankin's motor vehicle. Legrone pleaded not guilty.

At trial, Rankin testified that on July 29, 2021, she was completing her evening shift as a security guard at Pima Medical Institute in Renton. At around 11:00 p.m., Legrone showed up at her work, and another employee let him in "to use the restroom." At the time, Rankin was on the phone with her best friend, Gabriella Wheeler. When Rankin left work and got to the parking lot, she saw Legrone standing by her car. She told Wheeler to stay on the phone and mute herself so Legrone would not hear her.

When Rankin got in her car, Legrone got in on the passenger side. Rankin told Legrone to get out, but he refused, began cussing at her, and told her to drop him off in Des Moines. When Rankin said no, Legrone "balled up his fists and started strangling" her with both hands around her neck. At the same time, a security patrol car pulled up behind Rankin's car. She was going to scream for help, but Legrone told her that if she did, he "was going to kill" her.

Rankin then bit Legrone in the chest. After he let go "for a few seconds," he punched her in the head and started strangling her again. Rankin tried to take her key out of the ignition, but Legrone stopped her and told her to drive away because the security guard was still behind them. Rankin "drove off recklessly," hoping that she "would catch someone's attention." But Legrone made her stop

---

[1] We refer to Dorin Rankin Cerbillo as Rankin because that is how she identified herself at trial.

at a stop sign, hit her in the head, and told her to switch seats with him, which she did. Legrone told Rankin that if she left the car, he would kill her.

Once Legrone was in the driver's seat, he sped off toward Tukwila, hitting Rankin in the head and "calling [her] the b-word." Legrone eventually left the highway and drove down a back road in SeaTac. He was "ranting" about why Rankin "couldn't love him the way [she] loved [her] family" or her "past partners." He punched Rankin in the mouth and "busted" her lip, then "poked" her in the eye.

Legrone drove to a back road in Des Moines by a Safeway and Bartell Drugs. He parked on the side of the road, backhanded Rankin in the face, and started strangling her again. Legrone again brought up Rankin's past relationships. He then grabbed a knife out of his pocket and told her to get out of the car and go into the bushes, where they would "stab each other," and "only one of us was going to make it out alive." After a struggle, Rankin jumped out of her car, ran barefoot across the street, and asked some people if she could use their phone. They offered to call the police, but she refused because Legrone had told her that if she did so, he would hurt Rankin, Wheeler, and Wheeler's children. They did not let her use their phone.

Rankin testified that she then hid for a few minutes before walking to a bus stop, where she paid someone $20 to use their phone to call Wheeler because "that's the only number [she] had memorized." Rankin asked Wheeler to call Rankin's mother, who later picked up Rankin from the nearby Safeway.

3

For most of the incident, Rankin's phone was in the car and still connected with Wheeler. Wheeler testified that she could hear Legrone threatening to kill Rankin and hitting her, stating, "I'm hearing thumps, and her reaction to them, . . . like, stop hitting me." Wheeler could also hear Legrone choking Rankin, testifying that she "could hear . . . the struggle when someone chokes. . . . [L]ike, that they are gasping for air and that they can't breathe. And after he let go, you could tell her voice was faint, like, stop choking me. I can't breathe. Like, stop." Wheeler said that she could see the location of Rankin's phone using the Life360 app, and when she saw Rankin's car "on the move," she used another phone to call 911 so she could focus on Rankin's location and help the police "find her." The trial court admitted a recording of Wheeler's 911 call and played it for the jury.

Legrone's defense theory was that Rankin was jealous of his relationships with other women and falsified her accusations against him. Before trial, Legrone moved in limine to admit evidence of a March 2021 incident involving Rankin and Legrone. According to a Federal Way police report, officers responded to a domestic dispute on March 20 between Legrone and Rankin. Officer Colleen Borders spoke with Rankin and reported:

> Rankin stated her and Le[g]rone have been dating on and off again throughout the years. Rankin stated Le[g]rone wanted to get back with Rankin, and he arrived at her house in Auburn. Rankin stated she got into his vehicle and Le[g]rone took off towards Federal Way.
>
> Rankin stated she was kidnapped by Le[g]rone and they ended up at the Commons Mall parking lot in Federal Way. I asked Rankin if she left the vehicle once stopped at the Commons Mall, she stated "no." Rankin made the comment she punched Le[g]rone in the face

4

multiple times but she claimed "Self-defense," because she was being kidnapped. I asked again if Rankin attempted to try and flee the vehicle and she stated no. I asked if Rankin was held against her will and she refused to comment and kept saying "it was self[-]defense."

Rankin stated Le[g]rone also punched her in her face around her mouth area. I could not see any physical injuries on Rankin. She stated she was not in pain and did not need aid.

I saw fresh blood outside the driver's door. I asked Rankin if she was bleeding and she stated no. When asked whose blood was that she stated she did not know.

Officer Borders also asked Legrone "what had happened." According to Officer Borders' report, Legrone

stated he helped Rankin purchase a phone from another female. . . . As Le[g]rone spoke to me I could see blood pooling inside his mouth. I asked why he was bleeding, he stated, Rankin struck him in the face multiple times and caused his tooth to crack. I had Le[g]rone open his mouth on the left side I could see a tooth that was halfway missing and Le[g]rone's gums actively bleeding. . . . Le[g]rone stated Rankin went "crazy" because of a cellphone and struck him, unknown the amount of times.

Le[g]rone stated he pushed Rankin off of him while he was being struck. He stated that was the only time he put hands on Rankin. Le[g]rone refused any medical attention on scene.

Because of Legrone's "visible injuries" and Rankin's admission "that she struck [him] multiple times," Officer Borders placed Rankin in custody for DV fourth degree assault. But when Legrone saw Officer Borders arresting Rankin, he "recanted his whole story" and stated he would not cooperate with police, give any statements, or consent to being photographed.

Legrone argued that evidence of the March 20, 2021 incident was "central to the defense theory" because Rankin "lied to the police" and told them that he kidnapped her, "the same allegation as in this case." He argued the fact that

Rankin assaulted Legrone and falsely accused him of kidnapping "is admissible as motive and similar plan or conduct" under ER 404(b), and because Rankin claimed she bit Legrone in the chest in self-defense in the July 2021 incident, her "false claim of self-defense in March of 2021 is admissible to show a similar plan." Legrone also argued that under ER 608(b), evidence of the March 2021 incident was admissible "to impeach [Rankin] with specific instances of misconduct, including falsely accusing Mr. Legrone of assaulting and kidnapping her in March 2021."

The trial court excluded evidence of the March 2021 incident, explaining:

> The Court finds that while the fact the incident occurred has been shown by a preponderance of the evidence, there is nothing to show that Ms. Rankin actually lied to the police. This is particularly true given the dynamics surrounding [DV] relationships. Notably the officers could not testify as to what happened, rather they could only testify as to injuries observed and hearsay statements made to them, so it would result in a trial within a trial on a collateral matter. Furthermore, the Court finds that the probative value is not very high. The Court finds that this incident does not meet the threshold for modus operandi under the evidentiary rules and its tie to a theory that Ms. Rankin lied because she was jealous is tenuous. In contrast, the prejudicial effect is quite high given that Ms. Rankin was arrested in the earlier incident for assault because she did not have visible injuries and Mr. Legrone did. In the end, the Court finds the incident merely amounts to impermissible propensity evidence, the prejudice of which far outweighs any probative value.[2]

The jury ultimately hung on the charge of theft of a motor vehicle, which the trial court later dismissed. The jury found Legrone guilty of first degree kidnapping and second degree assault, and it also found that Legrone and

---

[2] The court indicated that it would allow defense counsel "to raise the incident in a sanitized manner" to impeach Rankin if she testified, consistent with a defense interview, that she had not seen Legrone since November 2020. That part of the court's ruling is not at issue.

6

Rankin were "intimate partners prior to or at the time the crime[s] were committed."

At sentencing, the trial court found that Legrone was a persistent offender under the POAA, also known as the "three strikes" law, and imposed LWOP on both convictions. In doing so, the court declined Legrone's invitation to "hold the three strikes law is unconstitutional as administered for all defendants and as to Mr. Legrone."

Legrone appeals.

## ANALYSIS

Legrone argues the trial court violated his constitutional right to present a defense by excluding evidence of the March 20, 2021 incident and erred by imposing an LWOP sentence under the POAA. He also asks us to remand to the trial court to strike the $500 VPA from his judgment and sentence due to his indigency. Finally, Legrone raises several arguments in three SAGs. We address each of his arguments in turn.

### Right to Present a Defense

Legrone argues that the trial court erred under ER 404(b) and 608(b) and violated his right to present a defense by excluding evidence of the March 20, 2021 Federal Way incident. We disagree.

" 'A criminal defendant's right to present a defense is guaranteed by both the federal and state constitutions.' " *State v. Butler*, 200 Wn.2d 695, 713, 521 P.3d 931 (2022) (quoting *State v. Jennings*, 199 Wn.2d 53, 63, 502 P.3d 1255 (2022)). We apply a two-part analysis to determine whether the exclusion of

7

evidence violates that right. *State v. Arndt*, 194 Wn.2d 784, 797-98, 453 P.3d 696 (2019). First, we review the evidentiary ruling for abuse of discretion. *Id.* at 797. Then, we consider de novo whether the ruling deprived the defendant of his constitutional right to present a defense. *Id.* at 797-98.

Legrone sought to admit evidence of the March 2021 incident under ER 404(b). That rule provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," but it "may . . . be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b). To admit evidence of other acts under ER 404(b), the trial court must (1) identify the purpose for which the evidence is sought to be introduced, (2) determine whether the evidence is relevant to prove an element of the charged crime, (3) weigh the probative value of the evidence against its prejudicial effect, and (4) find by a preponderance of the evidence that the act actually occurred. *State v. Lough*, 125 Wn.2d 847, 853, 889 P.2d 487 (1995).

Here, the trial court did not abuse its discretion by concluding that evidence of the March 2021 incident was inadmissible under ER 404(b). As much as Legrone offered the evidence to show that because Rankin lied about that incident, she must be lying now, that is exactly the kind of propensity evidence the rule prohibits. Furthermore, the evidence was, as offered by Legrone, relevant only to the extent it showed that Rankin lied to officers during the incident. But as the trial court observed, the responding officers could not

8

testify as to what happened between Legrone and Rankin—only what they observed at the scene.  So, as much as Legrone sought to admit the evidence to show something other than propensity, the trial court did not abuse its discretion by determining that Legrone failed to show by a preponderance that Rankin lied about what happened before the officers arrived on March 20.

Legrone also sought to admit evidence of the March 2021 incident under ER 608(b) to impeach Rankin.  As relevant here, that rule provides that specific instances of a witness' conduct may, "in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into *on cross examination* of the witness . . . concerning the witness' character for truthfulness or untruthfulness." ER 608(b).[3]

Again, the trial court did not abuse its discretion under ER 608(b).  When asked what testimony Legrone planned to present to show that Rankin lied in March 2021, Legrone responded that he planned to present the officers' testimony and, "potentially," his own.  But testimony about the incident from the officers and Legrone was not admissible under ER 608(b), which clearly states that except for convictions of certain crimes, instances of conduct "may not be proved by extrinsic evidence."  So, if Rankin denied on cross-examination that she lied to officers during the March 2021 incident, the inquiry would be at an end.  *See State v. Barnes*, 54 Wn. App. 536, 540, 774 P.2d 547 (1989) (in an attempt to impeach a witness, cross-examiner must take the answer of the

---

[3] Emphasis added.

9

witness and may not call a second witness to contradict the first witness). The trial court did not err by excluding evidence of the March 20, 2021 incident.

Finally, the trial court's evidentiary rulings did not deprive Legrone of his constitutional right to present a defense. Legrone himself says he had witnesses "waiting in the wings" to testify that Rankin was jealous of his relationships with other women. Yet he did not call any of those witnesses. And he does not articulate how the trial court's ruling about the March 2021 incident prevented him from calling them.

In any event, Legrone effectively impeached Rankin's credibility. For example, he elicited inconsistencies between Rankin's testimony and her interview with detectives, her testimony and her interview with defense counsel, her testimony and Wheeler's testimony, and her description of being strangled and a nurse's testimony about physical signs of strangulation. He also elicited testimony from Rankin that she claimed not to remember the name of her boyfriend at the time of the incident, yet she also testified that she set up her phone so that any missed calls would go to him. And as defense counsel pointed out in closing, Wheeler could be heard in the 911 call identifying the male voice in the background as "Nathan" or "Michael Johnson." In short, the trial court's exclusion of evidence about the March 2021 incident did not prevent Legrone from presenting his defense theory that Rankin falsified her accusation.

Legrone disagrees, relying mainly on *State v. Young*, 48 Wn. App. 406, 739 P.2d 1170 (1987). In that case, defendant Young, charged with vehicular homicide, claimed that Vince Setzer, one of the victim passengers, caused the

accident by reaching over and grabbing the steering wheel. *Id.* at 408. Young offered proof that three witnesses would testify that within the last year and a half, Setzer had grabbed the steering wheel away from a driver on four different occasions. *Id.* The trial court excluded the evidence under ER 403 as unduly prejudicial. *Id.* at 409. Division Three reversed, explaining that "ER 403 does not extend to the exclusion of crucial evidence relevant to the central contention of a valid defense." *Id.* at 413. The court observed that "evidence of Mr. Setzer's conduct on the night of the accident was highly probative and crucial" to Young's theory that it was not him, but Setzer, who caused the accident. *Id.*

Here, as discussed, Legrone could offer no testimony to prove that Rankin committed the relevant act on March 20, 2021—a false kidnapping and assault accusation. So, the evidence was neither highly probative nor crucial to his defense theory. *Young* does not require reversal.

LWOP Sentence

Legrone next argues that the trial court erred by sentencing him to LWOP under the POAA, which he asserts is unconstitutional. We review constitutional challenges de novo. *State v. Ross*, 28 Wn App. 2d 644, 646, 537 P.3d 1114 (2023), *review denied*, 2 Wn.3d 1026, 544 P.3d 30 (2024).

Relying on *State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018), Legrone asserts that we "should hold the three strikes law is unconstitutional as administered for all defendants and as to [him]" because of the substantial racial disparity in three strikes defendants, and because only 10 other states impose such sentences. In *Gregory*, our Supreme Court held that Washington courts

11

imposed the death penalty in an arbitrary and racially biased manner, violating the state constitutional prohibition on cruel punishment.[4] 192 Wn.2d at 35; WASH. CONST. art. I, § 14 ("Excessive bail shall not be required, excessive fines imposed, nor cruel punishment inflicted."). In so holding, the court converted all death sentences to life imprisonment. *Gregory*, 192 Wn.2d at 35-36.

Legrone correctly points out that the *Gregory* court "decline[d] to require indisputably true social science to prove that [Washington's] death penalty is impermissibly imposed based on race." 192 Wn.2d at 21. Still, the court "afford[ed] great weight" to a statistical analysis that went through a "rigorous review process," including factfinding by a commissioner. *Id.* at 19, 20 n.7. And the analysis showed that the "*process* by which the death penalty [was] *imposed*" was administered in an arbitrary and racially biased manner. *Id.* at 14, 18-19.[5] For example, the analysis showed that "[a]t the very most, there is an 11 percent chance that the observed association between race and the death penalty . . . is attributed to random chance rather than true association." *Id.* at 20. And the commissioner found that

> "special sentencing proceedings in Washington State involving
> Black defendants were between 3.5 and 4.6 times as likely to result
> in a death sentence as proceedings involving non-Black defendants

---

[4] Legrone also argued below that the POAA violates equal protection. But he does not engage in an equal protection analysis in his briefing before this court. Accordingly, to the extent he renews his equal protection argument, we decline to consider it because it is inadequately briefed. *See Norcon Builders, LLC v. GMP Homes VG, LLC*, 161 Wn. App. 474, 486, 254 P.3d 835 (2011) ("We will not consider an inadequately briefed argument.").

[5] Emphasis added.

after the impact of the other variables included in the model has been taken into account."

*Id.* at 19.

Legrone points out that Black men like himself are overrepresented among defendants sentenced to LWOP under the POAA. But, unlike *Gregory*, he provides no analysis showing that this is because courts *administer* the POAA in an arbitrary and racially biased manner. As Division Two recently observed in *State v. Nelson*, ___ Wn. App. 2d ___, 550 P.3d 529, 535 (2024), "imposition of a[n] LWOP sentence under the POAA involves a different procedure than the imposition of the death penalty addressed in *Gregory*." It pointed out that "the POAA is not administered on a case by case basis as the death sentence was administered in *Gregory*"; instead, it "is administered the same way no matter who the defendant; *all* offenders who commit three [strike] offenses will be sentenced to LWOP."[6] *Id.* So, it declined to invalidate the POAA under *Gregory*'s framework. *Id.*

Furthermore, our Supreme Court has held that LWOP sentences do not constitute cruel punishment. *See State v. Moretti*, 193 Wn.2d 809, 820, 446 P.3d 609 (2019) ("We have continually upheld sentences imposed under the POAA as constitutional and not cruel under article I, section 14."); *cf. Gregory*, 192 Wn.2d at 14 (" 'The death penalty differs qualitatively from all other punishments, and

---

[6] We recognize that racial disproportionality may occur before an offender appears before the court facing an LWOP sentence. For example, police may disproportionally arrest Black offenders for offenses that result in an LWOP sentence and/or prosecutors may disproportionally charge Black offenders with crimes that result in an LWOP sentence. But those issues occur outside the court's administration of POAA sentences.

therefore requires a correspondingly high level of reliability.' ") (quoting *State v. Pirtle*, 127 Wn.2d 628, 663, 904 P.2d 245 (1995)).

In short, while we share *Nelson*'s "serious concerns about the racially disproportionate impact of the POAA," Legrone does not show that this impact results from racially biased administration of the POAA. 550 P.3d at 535. The trial court did not err by sentencing Legrone to LWOP as mandated by the POAA.

VPA

Legrone next asserts we should remand to the trial court to strike the $500 VPA from his judgment and sentence based on his indigency. We agree.

Effective July 1, 2023, the legislature prohibited courts from imposing the VPA on indigent defendants. *See* LAWS OF 2023, ch. 449, § 1 (amending RCW 7.68.035). The trial court sentenced Legrone on March 17, 2023, before the amendments took effect. But the amendments to RCW 7.68.035 apply to cases on direct appeal. *State v. Ellis, 27 Wn.* App. 2d 1, 16, 530 P.3d 1048 (2023).

The State does not dispute that Legrone is indigent and concedes that remand is appropriate. We accept the State's concession and remand to strike the VPA.

SAGs

Legrone makes several arguments in three SAGs. As discussed below, none require reversal.

First, Legrone argues that the trial court erred by allowing certain testimony and that the prosecutor erred by eliciting the testimony. We disagree.

14

At trial, Rankin testified on direct that after she and Legrone ended their relationship, she would see him "here and there." Legrone points out that when the prosecutor asked Rankin, "[W]hat were those situations usually like," Rankin responded, "Um, usually physical altercations." Later, Rankin testified that when Legrone asked her during the incident why she could not love him the way she loved her family, she told him that she "couldn't love him because he tried to keep [her] away from [her] family."

Legrone contends that the trial court erred under ER 404(b) by admitting the testimony, and that by eliciting it, the prosecutor either committed misconduct or opened the door to evidence of the March 2021 incident. But the trial court sustained defense counsel's objection and instructed the jury to disregard Rankin's "physical altercations" testimony. And Legrone does not show that the jury ignored this instruction. *See State v. Martinez*, 2 Wn. App. 2d 55, 77, 408 P.3d 721 (2018) (we presume jurors follow the court's instructions). Further, to be entitled to relief, Legrone must establish that the "physical altercations" testimony prejudiced him. *See State v. Agee*, 89 Wn.2d 416, 419, 573 P.2d 355 (1977) ("[E]rror without prejudice is not ground for reversal."). But he shows no prejudice.

As for Rankin's testimony about why she told Legrone she could not love him, the trial court overruled Legrone's ER 404(b) objection to that testimony. The court reasoned that the State did not offer it to show conformity with a prior act, but to explain Legrone's motive. We are unpersuaded that this was an abuse of discretion. And even if it was, Legrone does not show that he was

prejudiced by the admission of Rankin's vague testimony in this regard. He also does not establish that this indefinite testimony opened the door to questioning about the March 2021 incident. *See State v. Broussard*, 25 Wn. App. 2d 781, 791, 525 P.3d 615 (2023) (" 'A party may open the door to otherwise inadmissible evidence by introducing evidence *that must be rebutted* in order to preserve fairness and determine the truth.' ")[7] (quoting *State v. Wafford*, 199 Wn. App. 32, 36-37, 397 P.3d 926 (2017)).

Next, Legrone contends that the trial court erred by admitting certain testimony of Rankin and Wheeler to the extent that Rankin and Wheeler contradicted one another or contradicted a police officer's testimony. He points out that the conflicts called both Rankin's and Wheeler's credibility into question. But this is not a basis for relief because determining the credibility of witnesses and resolving conflicting evidence is the exclusive province of the jury, not the court. *See State v. Allen*, 116 Wn. App. 454, 466, 66 P.3d 653 (2003).

Finally, in a "Motion to Allow [Amended] Sta[t]ement of [A]dditional Grounds" attached to his May 9, 2024 SAG, Legrone claims "ineffective assistan[ce] of counsel," "properly addressing a hostile [witness] by impeaching her and implementing ER 607," and "violation of confrontation clause rights" under the Sixth Amendment to the United States Constitution.[8] But he does not articulate the basis for these claims, so we do not consider them. *See* RAP 10.10(c) ("Reference to the record and citations to authorities are not necessary

---

[7] Emphasis added.

[8] As much as we have addressed the claims here, we grant the motion.

16

or required [in a SAG], but the appellate court will not consider a defendant's [SAG] if it does not inform the court of the nature and occurrence of alleged errors.").

We remand to the trial court to strike the $500 VPA from Legrone's judgment and sentence. Otherwise, we affirm his convictions and sentence.

Brennan, J.

WE CONCUR:

Feldman, J.

Hazelrigg, ACJ