# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Personal Restraint of | No. 60089-7-II |
| THOMAS TOREN NISSEN, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, J.—13-year-old HA accused Thomas Nissen, her aunt's fiancé, of touching her inappropriately on multiple occasions. HA's mother reported Nissen to law enforcement. Law enforcement officers interviewed HA twice. The officers then confronted Nissen with HA's accusations in an interview. Nissen admitted to two instances of touching but said that he did not remember any others, and he told the officers he was an alcoholic. The last 10 minutes of his interview, including Nissen's admissions, were recorded. Nissen was arrested and charged with 1 count of first degree child molestation, 1 count of second degree child molestation, and 1 count of second degree rape of a child.

In the month before trial was set to begin, while Nissen's defense counsel was negotiating a possible plea deal with the State, the parties became aware of three new allegations against Nissen involving three new victims. Two weeks before trial, the State moved to amend the information to add the new charges, defense counsel agreed, and defense counsel moved to continue trial. Defense counsel told the court that she and her investigator were completely unprepared for trial, and she hoped to reach a plea resolution with the State on all of the charges

against Nissen. The trial court denied the motion to amend and the motion to continue. The State instead filed a separate information with the new charges.

On the Friday evening before the week of trial on the charges in this case, defense counsel presented Nissen with a plea offer that would have resolved all of his charges. Nissen rejected the deal. The following Monday, he told defense counsel he had changed his mind and he wanted to accept the offer. The next day, the morning of trial, defense counsel tried to enter the plea for Nissen but the State rejected the attempt, saying its offer had expired. Trial proceeded as scheduled for the charges involving HA.

At the State's behest, the trial court instructed the jury that voluntary intoxication was not a defense to the charges. Defense counsel did not object to the State's requested instruction and did not ask to add that voluntary intoxication could be considered when determining if Nissen had the requisite mental state to commit child molestation. The jury found Nissen guilty on all three counts, and the jury found a special "pattern of abuse" aggravator for the two molestation charges.

Defense counsel raised no mitigating information for Nissen at sentencing. Nissen was sentenced concurrently to an indeterminate sentence on the three counts, with a minimum of 240 months—an exceptional sentence 110 months above the standard range for his first degree child molestation charge.

Nissen appealed, arguing, among other things, that the trial court erred when it gave the jury an incomplete instruction on voluntary intoxication and that his counsel was ineffective because she failed to object to the incomplete instruction. This court affirmed.

Nissen now brings a timely personal restraint petition. He claims defense counsel provided ineffective assistance of counsel at the investigation, plea bargaining, trial, and sentencing stages

2

of his case. His petition includes an expert opinion that the investigating officers failed to follow best practices when interviewing HA and Nissen, potential flaws that defense counsel did not pursue. Another expert opinion points out instances where defense counsel did not comply with standards for representation of criminal defendants, including during sentencing. Nissen also claims that the trial court erred when it denied motions to amend the information and to continue trial, and he claims that his sentence is cruel because it is disproportionate.

We deny Nissen's petition and decline to order a reference hearing because for each of Nissen's claims his arguments fail as a matter of law, he has failed to provide adequate evidence to support his claim, or he has failed to establish the required prejudice.

FACTS

I. BACKGROUND

In April 2020, 13-year-old HA told a friend that her aunt's fiancé, Thomas Nissen, had touched her inappropriately. HA alleged that the touching had occurred regularly over the past several years when she visited her aunt and Nissen's house to spend time with her cousins. HA's friend's family alerted HA's mother, who reported the allegations to the Grays Harbor County Sheriff's Department.

Sheriff's Deputy Dave Iverson spoke to HA and her mother at their home. Our record does not contain the recording of the deputy's conversation with HA, nor was it admitted at trial. But Nissen's personal restraint petition counsel apparently provided an audio recording of the interview to Dr. Daniel Reisberg, an "expert on interview techniques and human memory." Pers. Restraint Pet. (PRP) at 44. According to Dr. Reisberg, Iverson's interview failed to follow best practices for interviewing children in several ways. Dr. Reisberg explains that Iverson interviewed

3

HA with her mother present. Dr. Reisberg states that Iverson did not begin by establishing "ground rules" with HA that she should ask for clarification if any questions were unclear or correct him if he mischaracterized her answers. App. to Pers. Restraint Pet. (App.) at 73.

Dr. Reisberg also states that Iverson asked many "yes/no" questions that contained suggestions. App. at 73. Most notably, he says that Iverson introduced several major points regarding the touching into the conversation for the first time. Dr. Reisberg reports that when HA said that Nissen touched her "'just down and up there,'" . . . [Iverson] offer[ed] his own interpretation: "'Your vaginal area[?]'" App. at 74. Dr. Reisberg reports that Iverson also asked, "'Did he stick his finger in you at all?'" to which HA gave "a clear 'no.'" *Id.*

Based on what HA and her mother told the deputy, the sheriff's department began an investigation. Detectives Steve Beck and Paul Logan set up and recorded a call where HA's mother confronted Nissen with HA's allegations. Although this recording is not in our record, the parties agree that Nissen denied the allegations on the confrontation call.

Beck and Logan conducted a second interview with HA after the confrontation call. Dr. Reisberg states that HA's mother was also present during this interview. Our record does not contain a recording of this conversation, but Nissen provided an audio recording to Dr. Reisberg. Again, Dr. Reisberg notes that the officers did not set ground rules at the beginning of the interview. Dr. Reisberg reports that the officers again asked HA suggestive yes/no questions: "'When you say touching you, you mean . . . your vagina?'"; and "'skin on skin?'" App. at 75. Dr. Reisberg states that this time, when the officers asked, "'At any time, did his fingers penetrate your vagina?'" HA answered affirmatively. *Id.*

After this conversation with HA, Beck and Logan approached Nissen at his workplace to interview him. The detectives spoke with Nissen for about an hour and 20 minutes in a conference room at Nissen's workplace. During the last 10 minutes of the interview, the detectives began recording. We have this recording in our record. The detectives confirmed with Nissen at the beginning of the recording that he understood he was free to leave. Nissen then admitted to touching HA's vagina on two instances: once on the couch under a blanket in his home, and once while they were riding an all-terrain vehicle (ATV) together. He specifically admitted he touched her vagina under her clothes in the first instance, and in the second, he admitted to touching her vagina. Nissen denied remembering the roughly 15 other instances of touching that HA alleged. But he said that he thought HA was telling the truth and that he probably could not remember because of his alcoholism. After Nissen gave his recorded statement, the detectives arrested Nissen and read him his *Miranda*[1] rights.

In April 2020, the State charged Nissen with 1 count of first degree child molestation, 1 count of second degree child molestation, and 1 count of second degree rape of a child. The first degree child molestation charge was based on an instance where Nissen laid behind HA on a couch where she was sleeping and touched her vagina. The second degree molestation charge was based on the instance where Nissen touched HA's vagina while they were both under a blanket. The rape charge was based on the instance where Nissen penetrated HA's vagina with his finger while they were riding on the ATV together. The State also alleged that the offenses were part of an ongoing pattern of sexual abuse. Trial was set for November 17, 2020.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

II. PRETRIAL

A.      CrR 3.5 Hearing and Denial of Motion to Amend

In late October and early November 2020, Nissen's counsel was negotiating a possible plea deal for Nissen with the prosecutor, Stephen Jackson. Around this time, the State was planning to file three new charges against Nissen involving three new victims.

On October 26, defense counsel told Jackson that she and her investigator were "not at all ready for trial." App. at 14. She said the judge "was unconcerned."[2] *Id.* She also said that as of the week before, her investigator had not yet spoken to the victims. Defense counsel and Jackson discussed continuing the case and filing an amended information that included the new victims as part of the same case.

On October 29, the court held a CrR 3.5 hearing to determine the admissibility of Nissen's recorded confession. Logan, Beck, and Nissen all testified at the hearing. Defense counsel argued that the interview was a custodial interrogation because the detectives' questions were intended to elicit incriminating responses. She further argued that "[n]obody in their right mind" would feel free to leave when police were asking specific questions about instances of child molestation after speaking to the alleged victim and her mother. Verbatim Rep. of Proc. (VRP) (Oct. 29, 2020) at 47. The trial court ruled that a reasonable person would have felt free to leave, the interview was not a custodial interrogation, and the recording was admissible.

At the end of the CrR 3.5 hearing, the trial court noted that there was another hearing scheduled for the following Monday, November 2, in which the State was set to argue a motion to amend the information and the defense was planning to argue a motion to continue. The trial court

---

[2] Judge David Edwards oversaw all of the relevant pretrial hearings and motions.

warned the parties, "If the motion to continue the trial includes as part of the basis the fact that there are three charges being added by [the State] . . . with three new victims, I'm not going to allow the amendment." VRP (Oct. 29, 2020) at 52.

B.      Denial of Motion to Continue

The parties continued to negotiate, but they failed to agree on a plea deal. Two weeks before trial was set to begin, defense counsel argued her motion to continue trial. She told the trial court that she and Jackson had "started plea negotiations again" but that she did not know if they were "getting anywhere." VRP (Nov. 2, 2022) at 54. She said that her team still needed to do a "significant amount of investigation." *Id.* The trial court expressed confusion as to "how there can be significant investigation to be done" since there were only four witnesses in the case—HA, her mother, and the two detectives. *Id.* Defense counsel reminded the court that there were now four victims, but the court responded that since it had not permitted Jackson to amend the information, there was only one victim. Defense counsel stressed again to the court that she was not ready for trial, but the court responded that she had had plenty of time to get ready. The trial court denied the continuance.

Defense counsel then asked to withdraw as counsel. The court denied her request.

C.      Final Plea Offer and Last-Minute Motion to Continue

With his personal restraint petition, Nissen included a declaration about the final plea offer he received. On the evening of Friday, November 13—11 days after the court denied the defense's motion to continue and 4 days before trial was set to begin—defense counsel visited Nissen in jail to present him with a plea offer from the State. According to Nissen, the offer was for the State to recommend a sentence of 120 months and would have "taken care of . . . all the charges"

in both the original case and the case with the three new victims. App. at 20. Nissen believes this was the first time his counsel had presented him with this particular offer. Nissen says that defense counsel did not tell Nissen the offer would expire if he did not accept it that day. Nissen rejected the offer that evening. But according to Nissen, over the weekend he "began to think about the risk of trial and . . . changed [his] mind." *Id.*

On Monday, November 16, the court held a hearing to arraign Nissen on the three new counts under a separate cause number. Charles Lane was appointed to represent Nissen on the new charges. Lane asked to continue the arraignment on the grounds that he had not yet been able to meet with Nissen, and the court granted the motion.

In the same hearing, defense counsel then moved once again to continue Nissen's trial on the original charges. She argued that the existence of the two separate but related cases would have negative consequences for Nissen at sentencing if he was convicted. She asked for a continuance to get Lane "up to speed" so they could "work together [to] find[] a resolution." VRP (Nov. 16, 2020) at 60. The court reminded defense counsel that Jackson "wanted to file [the new charges] on the eve of trial as . . . an amended information and [the court] wouldn't allow him to do it because it was . . . too close to the date of trial and so [the State] chose to file this new information." *Id.* The court further stated, "The fact that it may have some consequences for Mr. Nissen is not a reason to continue this trial that's been set . . . for some time." *Id.* The court denied the motion to continue.

Nissen claims that he "tried to contact [defense counsel] all day Monday [November 16] by phone" to tell her that he wanted to accept the State's plea deal and was ultimately able to leave

a message for her. App. at 21. He says that he spoke to her that evening and she told him that she would prepare the plea for him "to sign the following morning when [he] arrived for trial." *Id.*

The next day was the morning of trial. Nissen felt that defense counsel "seemed to believe that [they] could still accept the deal" at that point. *Id.* The State, however, was no longer "willing to accept the deal." *Id.*

### III. TRIAL

Trial proceeded as scheduled on November 17 before Judge Stephen Brown. The defense reserved opening statement. The State called several witnesses to testify, including HA; Trisha Wilder, HA's aunt and Nissen's fiancé; and detectives Beck and Logan.

A.      Testimony From HA and Her Aunt

HA testified that she would regularly visit Wilder and Nissen's house to spend time with her cousins, usually for a night or two at a time. She testified that Nissen "would touch [her] most every time [she] was there" on her "private parts," starting when she was around eight years old. VRP (Nov. 17, 2020) at 153. She described the specifics of three incidents: an incident where Nissen laid next to her on the couch where she was sleeping and touched her vagina under her clothes; an incident where Nissen put his fingers inside her vagina while they were riding on the ATV together; and an incident where they were under a blanket watching television together and he touched her vagina.

Defense counsel elicited testimony from HA that the track where she rode the ATV with Nissen contained potholes, and that Nissen would drive the ATV fast. She asked HA whether Nissen's touching on the ATV hurt her physically or caused her to bleed, and HA responded that it hurt "[a] little" but that there was no blood. VRP (Nov. 17, 2020) at 170. Defense counsel further

9

elicited testimony from HA that she had never seen or felt that Nissen had an erection during any of the times he touched her.

Trisha Wilder, Nissen's fiancé, testified that Nissen drank alcohol, and that "up until . . . the end, he was probably drinking an 18-pack of beer a night." VRP (Nov. 17, 2020) at 133. Defense counsel cross-examined Wilder about how Nissen spent time with HA and the other girls at the house. Wilder testified that Nissen sometimes helped the girls with gymnastics tricks. Defense counsel asked Wilder whether Nissen seemed "just kind of happy" when helping the girls, or if it seemed "creepy." VRP (Nov. 17, 2020) at 139. Wilder responded, "I guess happy." *Id.* She testified that she did not think Nissen had ever gotten an erection while playing with the girls and that she was not aware of him getting "any kind of sexual pleasure from this." *Id.* Defense counsel did not ask Wilder any questions about Nissen's alcohol consumption.

B.      Detectives' Testimony

Detective Beck testified about the confrontation call he had facilitated between HA's mother and Nissen. He described several statements Nissen had made on the call that Beck felt were "indicative of . . . wrongdoing." VRP (Nov. 17, 2020) at 117. These included Nissen's statement that he had "never intentionally [done] anything to" HA and Nissen's refusal to "say that [HA] was lying." VRP (Nov. 17, 2020) at 117-18. On cross-examination, the defense elicited testimony from Detective Beck that Nissen had not admitted to touching HA on the confrontation call.

Detective Logan also described the confrontation call. He testified that Nissen did not "make any admissions." VRP (Nov. 17, 2020) at 176. But, like Beck, Logan found it "significant" that Nissen would not say that HA was lying. *Id.* Logan testified, "[B]ased on my experience . . . ,

when somebody is accused of something, . . . that's a response I recognize as somebody who is guilty." VRP (Nov. 17, 2020) at 177. Logan also discussed his interview with HA. He testified that HA had described four separate instances of Nissen touching her inappropriately.

Logan then discussed the interview with Nissen at Nissen's workplace. He testified that he described to Nissen HA's allegations of four specific instances when Nissen had touched her inappropriately. Nissen initially denied the allegations and "continued to say he did not intentionally touch [HA] on her vagina." VRP (Nov. 17, 2020) at 181. But when further confronted, Nissen admitted to the conduct and "described two times that he remembered." VRP (Nov. 17, 2020) at 182. The State then introduced the recording of Nissen's confession into evidence and played it for the jury.

On cross-examination, defense counsel questioned Logan about how closely Nissen's admissions matched HA's allegations as the detectives had described them to Nissen. Logan testified that Nissen's account differed from HA's in that Nissen "tried to minimize some of what he was doing and used a lot of 'I don't remember because I was drunk.'" VRP (Nov. 17, 2020) at 187.

Defense counsel then asked Logan about the "skills" he uses when trying to get a confession. VRP (Nov. 17, 2020) at 188. Logan discussed rapport building and said that he typically asks a suspect to "explain . . . their side" of the story. 1 VRP (Nov. 17, 2020) at 189. Defense counsel asked Logan whether he would tell a suspect "that you know they did this," and Logan said he would. *Id.*

Logan also discussed his training for interviewing victims, including trainings on "forensic child interviewing" and "Reid's school of interviewing." VRP (Nov. 17, 2020) at 173. He

No. 60089-7-II

described some of the child interview methods he had been trained on, explaining that interviewers should "make sure [the child] understand[s] that if we get anything wrong, or if we say something that they don't understand . . . we want them to correct the interviewer." VRP (Nov. 17, 2020) at 174.

C.      Jury Instruction and Closing Statements

The defense rested without calling any witnesses.

The court provided the following instruction to the jury regarding voluntary intoxication: "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of that condition." VRP (Nov. 18, 2020) at 87. Defense counsel did not object to this instruction, nor did she insist on including a second sentence from the pattern instruction: "'However, in determining whether the defendant [acted] [or] [failed to act] with (fill in the requisite mental state), evidence of intoxication may be considered.'" *State v. Nissen,* No. 56597-8-II, slip op. at 7 (Wash. Ct. App. Sep. 19, 2023) (unpublished)[3](alterations in original) (quoting 11 WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 18.10 (5th ed. 2021)).

The State then emphasized the voluntary intoxication instruction in its closing argument:

"Voluntary intoxication is not a defense. . . . There may be some explanation of maybe part of the motivation, . . . but it's not a defense. There's no excuse. So the state is asking you not to get up on that type of thinking. . . . Wilder talks about, I think, an 18 pack of beer a day. That's -- that's a lot. No one is forcing it down his throat. This is voluntary intoxication and is not a defense to what the State is saying Mr. Nissen has done."

VRP (Nov. 18, 2020) at 101-02.

---

[3] https://www.courts.wa.gov/opinions/pdf/D2%2056597-8-II%20Unpublished%20Opinion.pdf

In her closing argument, defense counsel emphasized the importance of when each charged instance occurred because it was necessary to establish whether HA was over or under the age of twelve.[4] She discussed several discrepancies in witness testimony about HA's age at the time certain events occurred. Based on these discrepancies, she argued that HA was actually 12 years old, not under 12, at the time of all of the alleged incidents.

Defense counsel then discussed the incident on the ATV. She correctly reminded the jury that HA had reported no bleeding after Nissen had allegedly digitally penetrated her on the ATV and incorrectly claimed that HA had reported no pain. She argued that based on the lack of "side effects of . . . vaginal penetration," it was "possible" that Nissen had merely put "pressure on [her] labia." VRP (Nov. 18, 2020) at 109. Therefore, defense counsel argued, the elements of rape were not present.

Finally, defense counsel suggested that the sexual gratification element of the charged offenses was absent:

> My client says that he doesn't know why he did it and that he was drunk. And, honestly, I don't know why. He doesn't know why. I can't get inside of his head and neither can you guys. But the normal signs that someone would be sexually gratified are not there. Ms. Wilder testified that she saw him with the girls all of the time . . . but - he was happy, but wasn't leering at them or didn't have an erection or wasn't trying to touch them inappropriately . . . . And it's not until last year when [HA] was 12 that things went sideways. And he admits that and he's ashamed of that. He's ashamed that his drinking got out of control. He's ashamed that he touched [HA]. He is. But he didn't rape her. And this just started last year.

VRP (Nov. 18, 2020) at 110-11.

---

[4] This argument was apparently related to Nissen's first degree child molestation charge. First degree child molestation includes an element that the victim "is less than twelve years old." Former RCW 9A.44.083(1) (1994). By contrast, second degree child molestation and second degree rape of a child both include an element that the victim is "at least twelve years old but less than fourteen years old." Former RCW 9A.44.086(1) (1994); Former RCW 9A.44.076(1) (1990).

The jury convicted Nissen on all three counts. For both child molestation counts, it returned a special verdict finding that the offenses were "part of an ongoing pattern of sexual abuse." CP at 37-38. For the second degree rape of a child charge, the jury did not find an ongoing pattern of sexual abuse.

IV. SENTENCING

The standard sentencing range for the first degree child molestation charge was an indeterminate sentence with a minimum of 98-130 months and a maximum of life. The standard range for the second degree child molestation charge was a minimum of 57-75 months and a maximum of life. The standard range for the second degree rape of a child charge was a minimum of 146-194 months and a maximum of life.

The State requested a 300-month exceptional minimum sentence above the standard range on the first degree child molestation conviction, in agreement with the presentence investigation report. It also requested a concurrent 120-month sentence for the second degree child molestation charge and a concurrent 194 month sentence for the second degree rape charge.

The State told the court it was concerned that Nissen had "backtrack[ed] from the admissions he made to law enforcement" when speaking to the presentence investigator, evincing a "lack of remorse." VRP (Jan 11, 2021) at 9. The State then discussed the fact that the jury had found a pattern of abuse aggravator only as to the two child molestation charges and not to the rape charge. It suggested that the jury may have "misconstrued" the language in the jury instruction and taken "it very literally" given that, despite evidence of repeated sexual assaults, there was only evidence of one actual rape. VRP (Jan 11, 2021) at 10.

14

Finally, the State discussed the impact of Nissen's conduct on HA's mental health. It read aloud a letter from HA's mother, who reported that HA "ha[d] been diagnosed with PTSD, severe anxiety, and depression" and described extreme mental health consequences that HA had experienced in the aftermath of the abuse, including self-harm and an attempt to take her own life. VRP (Jan 11, 2021) at 12.

In response, defense counsel did not file a sentencing memorandum and spoke only briefly in Nissen's defense before he was sentenced. With regard to the length of the sentence, defense counsel argued:

> We are asking that if an exceptional sentence is imposed, it be capped at five years instead of the ten years above maximum. Mr. Nissen does have other pending charges, and those will be sentenced consecutively if he is found guilty, and I think . . . that is a better resolution here.

VRP (Jan 11, 2021) at 15-16.

The trial court noted that the defense had not argued any mitigating circumstances for the court to consider and stated that the court had reviewed the mitigating factors "provided for in the sentencing law, RCW 9.94A.535[,]" and did not believe that any applied. VRP (Jan 11, 2021) at 17. It mentioned that Nissen's "excessive" alcohol consumption had "come up at trial," but added that "the voluntary consumption of alcohol is not a mitigating circumstance that the [c]ourt can take into account." VRP (Jan 11, 2021) at 17-18.

The trial court sentenced Nissen to an exceptional indeterminate sentence of a minimum of 240 months and a maximum of life on the first degree child molestation charge. For the second degree child molestation charge it imposed a sentence with a minimum of 120 months and a maximum of life, and for the second degree rape of a child charge it imposed a sentence with a minimum of 194 months and a maximum of life. Because the sentences were set to run

concurrently, Nissen ultimately faced a minimum of 240 months and a maximum of life in prison.[5] The trial court stated that to arrive at these sentences, it considered "the impact on the victim," "Nissen's circumstances," and "the aggravating factors found by the jury." VRP (Jan 11, 2021) at 18.

## V. DIRECT APPEAL

Nissen appealed his conviction. *Nissen*, No. 56597-8-II, slip op. at 1. Nissen made two arguments that are relevant here. Nissen first claimed that "the voluntary intoxication instruction given to the jury was manifest constitutional error." *Nissen*, No. 56597-8-II, slip op. at 6. He noted that the given instruction omitted the second sentence from the pattern instruction that would have allowed jurors to consider an argument that the sexual gratification element was not satisfied because of Nissen's intoxication. *Id.* at 7. This court ruled that Nissen failed to show manifest error. *Id.* We reasoned that there was minimal evidence of Nissen's drinking in the record and that "Nissen's inability to remember the touching, or inability to remember why he did it or how he felt when he did it, does not inform the question of whether he could act for the purpose of sexual gratification at the time of the sexual contact." *Id.* at 7.

Second, Nissen argued that defense counsel provided ineffective assistance of counsel when she failed to object to the incomplete voluntary intoxication instruction. *Id.* at 11. This court held that Nissen failed to show that counsel's failure to object prejudiced him "[f]or the same reasons that Nissen could not establish that . . . the alleged error[] . . . had practical and identifiable consequences in his trial." *Id.*

---

[5] In his briefing, Nissen sometimes refers to his sentence as an indeterminate 300-month sentence. *See* PRP at 65. The additional 60 months come from Nissen's additional sentence on the later charges that the trial court did not allow the State to add by amendment. PRP at 69.

We affirmed Nissen's conviction. *Id.* at 13.

VI. PERSONAL RESTRAINT PETITION

Nissen timely filed this PRP. He claims that defense counsel provided ineffective assistance of counsel by inadequately preparing for trial, failing to convey a deadline for the State's final plea offer, failing to develop evidence of Nissen's drinking at trial, and failing to advocate for Nissen at sentencing. He claims that the trial court abused its discretion when it denied the motion to amend the information and the motion to continue trial on November 2, 2020. He argues that cumulative error requires us to grant his petition. And he argues that his sentence was cruel punishment because it was disproportionate. Alternatively, Nissen requests a reference hearing.

A.    Expert Reports

Nissen's PRP includes a report from Dr. Reisberg, the interviewing and memory expert, that alleges the police officers who talked to HA failed to follow best practices for child interviews in several ways, as detailed above. Additionally, Dr. Reisberg's report expresses concern about what procedures and techniques Beck and Logan used in the interview with Nissen before they began recording him. Dr. Reisberg notes that the detectives apparently already believed Nissen to be guilty when they began questioning him. According to Dr. Reisberg, police in these situations often "press the suspect toward a confession and, unfortunately, many of the techniques used for this purpose" can produce false confessions. App. at 76. Dr. Reisberg notes specifically that "the Reid procedure," an interviewing technique that Logan claimed to have been trained on, "has been widely criticized as coercive, and it is a procedure that creates a substantial risk of false confession." App. at 77.

Dr. Reisberg indicates that he and other experts were available to be retained at the time of Nissen's trial. He claims that if he had been consulted on the case, he would have encouraged defense counsel to "pursue these issues, both pretrial and potentially in cross-examination of the officers." App. at 76.

Nissen also obtained a declaration from Amy Muth, an experienced criminal defense attorney in Washington, discussing "the standards of practice applicable to defense of allegations of child sexual abuse." App. at 27.

B.    Judge's Comments About Plea Agreements

Nissen's PRP includes a copy of a 2016 article from The Daily World. The article quotes Judge Edwards calling for the Grays Harbor County Prosecuting Attorney to resign because he felt that her office had a long backlog of cases, and that she had been accepting too many plea agreements.

ANALYSIS

I. PERSONAL RESTRAINT PETITION STANDARDS

"To be entitled to relief on a PRP, a petitioner must establish by a preponderance of the evidence that there was a constitutional error that resulted in actual and substantial prejudice or that there was a nonconstitutional error involving a fundamental defect that inherently results in a complete miscarriage of justice" *In re Pers. Restraint of Wolf*, 196 Wn. App. 496, 502-03, 384 P.3d 591 (2016).

A successful petition must include "[a] statement of . . . the facts upon which the claim of unlawful restraint . . . is based and evidence available to support the factual allegations." RAP 16.7(a)(2). The petitioner's evidence must be enough to show "that [their] factual allegations are

based on more than speculation, conjecture, or inadmissible hearsay." *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992). If the petitioner's allegations are "based on matters outside the existing record, the petitioner must demonstrate that [they have] competent, admissible evidence to establish the facts that entitle [them] to relief." *Rice*, 118 Wn.2d at 886. "If the petitioner's evidence is based on knowledge in the possession of others" the petitioner "must present . . . affidavits or other corroborative evidence." *Id.* In recognition of the fact "that prison inmates face particular difficulties in obtaining evidence and court records," petitioners do not necessarily need to submit direct evidence but must at least "identify the existence of evidence and where it may be found." *In re Pers. Restraint of Ruiz-Sanabria*, 184 Wn.2d 632, 641-42, 362 P.3d 758 (2015).

This court should remand a petition for a reference hearing only if the "petitioner makes at least a prima facie showing of actual prejudice" by presenting sufficient evidence and the State has put forth "its own competent evidence" to establish a material factual dispute. *Rice*, 118 Wn.2d at 885-86.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Nissen argues that his trial counsel was ineffective at the trial preparation, plea bargaining, trial, and sentencing stages. The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution "guarantee[] the right to effective assistance of counsel" to all criminal defendants. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 672, 101 P.3d 1 (2004). To succeed on an ineffective assistance claim, the petitioner must show that "'counsel's representation was deficient'" and that "'counsel's deficient representation prejudiced the

defendant.'" *Davis*, 152 Wn.2d at 672 (quoting *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995)).

Representation is deficient if it falls "'below an objective standard of reasonableness based on consideration of all the circumstances.'" *Id.* (quoting *McFarland*, 127 Wn.2d at 334-35). Courts reviewing ineffective assistance claims start "with a strong presumption that counsel's representation was effective," which the "[p]etitioner can 'rebut . . . by proving that [their] attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy.'" *Id.* at 673 (quoting *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986)).

Prejudice exists when "'there is a reasonable probability that,'" but for counsel's deficiency, "'the result of the proceeding would have been different.'" *Id.* at 672-73 (quoting *McFarland*, 127 Wn.2d at 335. A "reasonable probability [is] 'a probability sufficient to undermine confidence in the outcome.'" *Id.* at 673 (quoting *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). Because the prejudice standard for ineffective assistance of counsel is equivalent to the prejudice standard for personal restraint petitions, a successful ineffective assistance of counsel claim will "necessarily" entitle a personal restraint petitioner to relief. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012).

A.      Preparation and Trial

Nissen argues that he received ineffective assistance of counsel because his attorney failed to adequately prepare a defense in several ways. Specifically, Nissen claims that counsel did not interview any witnesses, including the police officers who interviewed HA and Nissen. Nissen also complains that counsel failed to either hire an expert on law enforcement interview techniques

or conduct independent research on that topic. As a result of counsel's failures, Nissen argues, counsel was unprepared to cast doubt on "the reliability of HA's testimony and [Nissen's] own confession" by cross-examining the officers about their interview techniques. PRP at 60. Additionally, Nissen contends that counsel failed to "further investigate" Nissen's alcohol use after being put "on notice" of it in Nissen's recorded confession. PRP at 41. He argues this failure prevented her from developing "a possible voluntary intoxication defense to the sexual gratification element." *Id.*

"[A] defense attorney has a 'duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *Davis*, 152 Wn.2d at 721 (quoting *Strickland* 466 U.S. at 691. "This includes investigating all reasonable lines of defense." *Id.* "The duty to investigate 'does not necessarily require that every conceivable witness be interviewed.'" *Id.* at 739 (quoting *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir.), *amended by* 253 F.3d 1150 9th Cir. 2001). But failure to pursue evidence that would support the defense "with an adequate pretrial investigation may, under certain circumstances, establish constitutionally deficient performance." *Id.* At minimum, a defendant arguing that counsel deficiently failed to investigate "must show a reasonable likelihood that the investigation would have produced useful information not already known to the defendant's trial counsel." *Id.* "[D]epending on the nature of the charge and the issues presented, effective assistance of counsel may require the assistance of expert witnesses to test and evaluate the evidence against a defendant." *State v. A.N.J.*, 168 Wn.2d 91, 112, 225 P.3d 956 (2010).

Nissen's claim that defense counsel failed to investigate and was unprepared for trial is sweeping. But because Nissen must show prejudice to prevail on an ineffective assistance of

counsel claim, we evaluate each of his possible trial defenses individually. Nissen raises three possible defenses here: (1) that Nissen put pressure on HA's labia during the ATV incident but did not penetrate her, so the jury should not find Nissen guilty of second degree rape; (2) that Nissen's extreme alcohol consumption meant that he did not act for sexual gratification, so the jury should not find Nissen guilty of either child molestation charge; and (3) that the officers' techniques when questioning him were flawed and produced a false confession.

### 1.    Lack of penetration

"A person is guilty of rape of a child in the second degree when the person has sexual intercourse with another who is at least twelve years old but less than fourteen years old . . . and the perpetrator is at least thirty-six months older than the victim." Former RCW 9A.44.076(1) (1990). "Sexual intercourse" includes "any penetration of the vagina or anus however slight, by an object, when committed on one person by another." Former RCW 9A.44.010(1)(b) (2007).

Nissen claims that counsel's failure to hire an interviewing expert or otherwise investigate the problems with the officers' interviews of HA prejudiced him because "HA reversed herself on the question of penetration, which may have been caused by the improper form of questioning." PRP at 56. Nissen makes a number of related factual allegations: that the officers interviewed HA with her mother present; that the officers "failed to set ground rules" directing HA to correct any incorrect assumptions the officers were making; and that the officers "used yes/no questions, suggested actions that may not have taken place, and introduced vocabulary." *Id.* To support these allegations, Nissen provides Dr. Reisberg's report. The report discusses the officers' interviews with HA in some detail and explains how poor interview practices could have caused HA to say for the first time in her second interview that Nissen penetrated her vagina.

Although Nissen claims that defense counsel never interviewed witnesses, including the officers, all we can see in our record is that as of three weeks before trial, counsel had not interviewed HA and that as of two weeks before trial, counsel still had "a significant amount of investigation that" needed to be done. VRP (Nov. 2, 2020) at 54. We do not know what occurred in the three weeks before trial. We do not have evidence in our record about whether counsel ever interviewed the officers or otherwise investigated their interview techniques. Although PRP counsel asked trial counsel whether she looked into the officers' investigative interview training, she did not respond. *See* PRP at 39-40; App. at 1-3, 7.

Moreover, we presume that counsel's representation was effective, and it is Nissen's burden to show that it was not. *Davis*, 152 Wn.2d at 673. Without access to recordings or transcripts, we cannot know for certain what was said in the interviews of HA.[6] This situation does not implicate the "particular difficulties" that incarcerated people face "in obtaining evidence." *Ruiz-Sanabria*, 184 Wn.2d at 642. According to the Reisberg report that Nissen himself submitted, Nissen's PRP counsel is in possession of audio recordings and transcripts of the interviews. Nissen could have provided these materials to this court but did not do so. We note that Dr. Reisberg also raises the possibility that HA's initial statement that Nissen did not penetrate her applied specifically to the blanket incident, and her later statement that Nissen did penetrate her applied to the ATV incident. Thus, without access to the entire interviews, we cannot rule out that counsel decided the content of HA's interviews may have been more harmful than helpful and accordingly

---

[6] The record on direct appeal was transferred to this case, but it did not contain any recordings or transcripts of interviews with HA.

made a strategic decision to avoid having them discussed in testimony and possibly played for the jury.

Dr. Reisberg opines, based on his review of the audio recordings, that defense counsel could have questioned the officers about their failure to follow best practices when interviewing HA. In particular, the interviewing officer allowed HA's mother to remain with her during the interview, the officer did not give adequate instructions encouraging HA to correct any incorrect assumptions, and most importantly, the officer used yes or no questions and introduced concepts or facts, like penetration, before HA mentioned them. Reisberg concludes that these interview techniques "departed from best practice in multiple ways." App. at 75.

But Dr. Reisberg also explains that he cannot say to what extent the problematic interview techniques influenced HA's report. Although he suggests that HA's allegation that Nissen penetrated her vagina could have come about as a result of suggestion from the interviewer, especially because HA initially denied penetration occurred, Reisberg also said that he would "leave it to others to decide how much these mis-steps might have shaped [HA]'s report." App. at 76. And as mentioned above, he was equivocal about which incident HA's answers about penetration actually referred to. Overall, Reisberg did not offer an opinion as to whether the interview techniques he identified as problematic resulted in prejudice to Nissen.

Significantly, as this court explained on direct appeal, Nissen admitted that he touched HA's vagina on two occasions, and one of the instances he remembered was the instance when they were riding on the ATV. *See Nissen,* No. 56597-8-II, slip op. at 10. HA testified consistent with her statement in the interview that Nissen penetrated her vagina when they were riding on the ATV, and the jury had a chance to evaluate her credibility on this point. Nissen did not deny that

the incident on the ATV occurred, and he said he thought HA was telling the truth. He never specifically denied HA's accusation of penetration. Consistent with his admissions, he told his fiancé, HA's aunt, that "he had done some things to [HA] that he wasn't proud of and that he would be going [to jail] for awhile." VRP (Nov. 17, 2020) at 134.

Thus, even if Reisberg's report amounts to some competent admissible evidence that the officers who interviewed HA used faulty and potentially suggestive interview techniques, Nissen has presented no evidence to establish that counsel failed to investigate or explore this issue in the three weeks before trial. He has not presented evidence that counsel failed to make a strategic decision about HA's interviews. And even assuming counsel failed to investigate this issue or was otherwise deficient, in light of the other evidence, including HA's testimony before the jury and Nissen's confession, Nissen has not shown "'there is a reasonable probability that,'" but for counsel's deficiency, "'the result of the proceeding would have been different.'" *Davis*, 152 Wn.2d at 672-73 (quoting *McFarland* 127 Wn.2d at 335).

We therefore hold that Nissen has failed to provide sufficient evidence to support these allegations.

### 2. Alcoholism negating sexual gratification

First and second degree child molestation include an element of sexual contact with the victim. Former RCW 9A.44.083 (1994); Former RCW 9A.44.086 (1994). "Sexual contact" means "any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desire of either party or a third party." Former RCW 9A.44.010(2).

Nissen argues that counsel's failure to develop evidence of Nissen's alcoholism, failure to object to the incomplete jury instruction regarding involuntary intoxication, and failure to develop

25

evidence of Nissen's drinking at trial prejudiced him because the jury might otherwise have concluded that the "sexual gratification" aspect of Nissen's child molestation charges was absent. PRP at 41-44.

Nissen points to *State v. Stevens*, 158 Wn.2d 304, 143 P.3d 817 (2006), to argue that voluntary intoxication can "negate the sexual gratification element." PRP at 41. *Stevens* involved a defendant charged with child molestation for grabbing a 13-year-old girl's breast while he was drunk. 158 Wn.2d at 306-07. The Washington Supreme Court held the trial court improperly refused to provide the jury with an instruction that voluntary "'intoxication may be considered in determining whether the defendant acted with intent and/or knowledge.'" *Id.* at 308 (quoting record). The Supreme Court reasoned that sexual gratification is the level of "[i]ntent . . . relevant to the crime of second degree child molestation because it is necessary to prove the element of sexual contact" and that "[w]ithout the proposed jury instruction on voluntary intoxication, Stevens was [therefore] precluded from arguing his theory of the case to the jury." *Id.* at 310. "Had the jury believed Stevens' evidence and had they been properly instructed, the jury could reasonably have found Stevens' intoxication prevented him from acting for the purpose of sexual gratification." *Id.*

Nissen already raised counsel's failure to object to the incomplete voluntary intoxication jury instruction on direct appeal, and this court ruled that he failed to show prejudice resulted from counsel's failure. *Nissen*, No. 56597-8-II, slip op. at 11-12. Its reasoning was twofold: first, there were "*only* two pieces of evidence at trial that related to Nissen's drinking," Wilder's testimony that Nissen was drinking 18 beers a night and Nissen's statement in the recorded confession that he did not remember many instances of touching HA due to his alcoholism. *Nissen*, slip op. at 7-8. And second, "Nissen's inability to remember the touching, or inability to remember why he did

it or how he felt when he did it, does not inform the question of whether he could act for the purpose of sexual gratification at the time of the sexual contact." *Nissen*, slip op. at 8. Nissen cannot raise again the contention that counsel was ineffective when she failed to object to the incomplete instruction because that issue was already decided on direct appeal.

Moreover, even if counsel had been better prepared and had brought out more detailed evidence at trial that Nissen was drunk at the time of the alleged incidents, there is not a reasonable probability that the jury would have found differently with regard to sexual gratification. The recording of Nissen's interview with detectives that was played for the jury contained his statement that he could not recall many alleged instances because of his alcoholism. His fiancé corroborated the extent of his drinking by telling the jury he was consuming 18 beers in a night, a remarkable amount. And both counsel discussed his drinking during the relevant time period during closing arguments.

To the extent Nissen attempts a broader argument here, specifically that his counsel failed to develop further evidence of his intoxication when committing the crimes against HA, Nissen fails to prove that more thorough investigation or questioning would have provided the evidence necessary to support this defense. Nissen does not include an affidavit from either himself or Wilder stating that he was drunk during any of the incidents for which he was charged or even explaining how much he was drinking and how often he was black-out drunk during the relevant time period. Nissen also does not include a report from an expert explaining how alcohol affects the brain and could negate sexual gratification. Additionally, Nissen argues that "competent counsel would have sought" an alcohol evaluation but does not provide any evidence showing what such an evaluation would have revealed or how the absence of such a report was prejudicial.

Reply Br. in Support of PRP at 21. We therefore hold that Nissen failed to present sufficient evidence to show that any alleged failure of counsel to prepare a voluntary intoxication defense prejudiced him.

### 3. Invalidity of Nissen's confession

Nissen argues that counsel's lack of preparation rendered her unable to cross-examine the detectives on the methods they used to interview Nissen and elicit his confession. He claims that "there was not a single question on the method of the interview to the officers." PRP at 44. Nissen contends that had defense counsel been better prepared, she could have cross-examined the officers about Nissen's military background—which Nissen contends trained him to obey authority and "'arguably . . . would have made him more vulnerable to police assertions and pressures'"—and the "[h]unger and nicotine deprivation" which he alleges were "evident at the end of the interview, when the recorded confession took place." PRP at 60 (quoting record).

Nissen fails to identify how any of the interviewing officers' conduct was improper. Moreover, Nissen does not demonstrate a reasonable probability that, had counsel pursued these lines of inquiry, he would have been found not guilty. In addition to his confession, Nissen does not dispute that even when he initially denied HA's allegations during the confrontation call, he refused to say that HA was lying. And he admitted to his fiancé that he had engaged in behavior with HA that would result in him going to jail. Because Nissen fails to explain why the jury would have been likely to acquit him had counsel investigated and cross-examined the officers on their interview techniques, we hold that he does not show prejudice.

Nissen similarly argues that his CrR 3.5 hearing "might have been different if counsel had been prepared" to cross-examine the officers on their interview techniques. PRP at 59 (boldface

28

omitted). But the trial court held that Nissen's confession was voluntary because he was "not in custody . . . during the taking of his statement" and was "free to leave." Clerk's Papers at 21; *see also State v. Falk*, 17 Wn. App. 905, 909, 567 P.2d 235 (1977) ("The constitutional concerns exemplified by CrR 3.5 apply only to custodial statements."). Nissen does not explain how an attack on the detectives' interview techniques might have changed the trial court's determination that the interview was not custodial. To the extent Nissen is asserting that his military background made him less likely to believe he was free to leave the interview, he expressly confirmed he knew he was free to go at the beginning of the recorded portion. Therefore, this contention also fails.

B.     Plea Bargaining

Next, Nissen argues that counsel was ineffective when she failed to convey to Nissen that a plea offer from the State would expire if not accepted promptly. Nissen also claims that counsel's lack of preparation for trial prejudiced him at the plea bargaining stage. He argues that counsel was unable to "adequately advise [him] on the plea bargain[] because she had not completed crucial investigation" and that this caused his "hesitation" to accept the deal. PRP at 63.

"Defense counsel must actually and substantially assist a client in deciding whether to plead guilty." *State v. Edwards*, 171 Wn. App. 379, 394, 294 P.3d 708 (2012). "In the plea bargaining context, counsel must communicate actual offers, discuss tentative plea negotiations, and discuss the strengths and weaknesses of the defendant's case so that the defendant knows what to expect and can make an informed decision on whether to plead guilty." *Edwards*, 171 Wn. App. at 394. An attorney has a duty to investigate not only to prepare for trial but also to ensure that they can assist their client during the plea process. *A.N.J.*, 168 Wn.2d at 111. "[A] defendant's

counsel cannot properly evaluate the merits of a plea offer without evaluating the State's evidence." *A.N.J.*, 168 Wn.2d at 109.

1. Failure to convey deadline

Nissen's claim that defense counsel provided ineffective assistance of counsel by failing to tell him that the November 13 offer had a deadline fails because nothing in the record that indicates counsel knew or should have known that Nissen had to accept the offer that same day. Indeed, Nissen admits that counsel "seemed to believe that [they] could still accept the deal" on November 17, the morning of trial. App. at 21. If counsel had no reason to believe that the State would refuse to move forward with the plea on November 17, she cannot have provided ineffective assistance when she failed to convey a deadline she did not know about to Nissen. And again, Nissen originally rejected the offer when he received it on November 13. He does not show that he would have made a different decision if defense counsel had told him that the offer would expire the next day. Thus, he shows neither deficient performance nor prejudice.

2. Failure to investigate causing inadequate counseling on plea

Additionally, Nissen fails to show how defense counsel's alleged failure to interview witnesses or otherwise investigate the case prejudiced him in plea bargaining. Nissen claims that he initially rejected the State's offer when counsel presented it to him on November 13 because he lacked "the information he needed to make an informed choice." PRP at 63. In his reply brief, Nissen suggests that if defense counsel had been more prepared, she could have told him, "'I interviewed the officers,' and 'I think this is the best strategy for trial, but if I were in your shoes, I would plead.'" Reply Br. in Support of PRP at 20 (quoting record). Although Nissen provides a declaration outlining when defense counsel presented the offer and when he rejected and later

30

accepted it, he opts not to share the contents of his conversation with her. Without that information, we cannot determine how more preparation would have led defense counsel to more effectively persuade Nissen to take the deal. Once again, Nissen's claim fails because he does not provide this court with sufficient evidence to evaluate it.

C.      Sentencing

Finally, Nissen claims that counsel failed to adequately prepare for sentencing or to advocate for Nissen at sentencing. He contends that she neither interviewed witnesses nor tried to obtain HA's "psychological and school records," which could have "contextualiz[ed]" the mental health issues that HA's mother said HA had begun suffering from as a result of Nissen's conduct. PRP at 46, 48. Nissen also claims that counsel did not file a sentencing memorandum in his defense. Finally, Nissen complains that counsel did not present any mitigating material, such as letters of support or information about his past military service, to the sentencing court. In the sentencing context, prejudice exists "if, but for . . . counsel's deficient performance, there is a reasonable probability that [the] sentence would have been differe[nt]." *State v. Calhoun*, 163 Wn. App. 153, 168, 257 P.3d 693 (2011). "[A]n allegedly unsuccessful or poor quality sentencing argument alone is unlikely to result in demonstrable prejudice because of the near impossibility of showing a nexus between the argument and the eventual sentence" *State v. Goldberg*, 123 Wn. App. 848, 853, 99 P.3d 924 (2004).

The Washington Performance Guidelines for Criminal Defense Representation state that defense counsel is obligated "[t]o ensure all reasonably available mitigating and favorable information, which is likely to benefit the client, is presented to the court." WASH. ST. BAR ASS'N, WASHINGTON PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION 8.1(d)

(amended 2020).[7] The guidelines state that "[c]ounsel should prepare and present to the court a defense sentencing memorandum where there is a strategic reason for doing so," and that this memorandum may include "mitigating factors and relative culpability, prior offenses, personal background, [and] employment record and opportunities." *Id.* at 8.6(a)(4). "A complete memorandum may require counsel to conduct an independent investigation regarding mitigating evidence." *Id.* at 8.6(a)(9). Overall, "[c]ounsel should be prepared at the sentencing proceeding to take the steps necessary to advocate fully for the requested sentence and to protect the client's interest." *Id.* at 8.7(a).

Based on the guidelines, defense counsel may have performed deficiently when she failed to present any mitigating information at sentencing. Her statement at the sentencing hearing was brief; she pointed out that the jury had not found an aggravator on Nissen's rape charge, asked the trial court to cap his sentence "at five years instead of the ten years above the maximum," and reminded the court that Nissen had "pending charges" that would "be sentenced consecutively if he [was] found guilty." VRP (Jan. 11, 2021) at 15-16. The State does not dispute Nissen's assertion that defense counsel did not file a sentencing memorandum, and the trial court stated at the hearing that it "did not hear defense argue or assert any mitigating circumstances that the Court should consider." VRP (Jan. 11, 2021) at 16.

Although we are skeptical that defense counsel's performance was adequate in light of her clear departure from the guidelines, Nissen's claim fails because he cannot show prejudice.

---

[7] https://www.wsba.org/docs/default-source/legal-community/committees/council-on-public-defense/performance-guidelines-for-criminal-defense-rep-sept-2020-final.pdf?sfvrsn=3fae0bf1_0.

Although defense counsel did not mention Nissen's drinking, the trial court independently considered Nissen's "excessive" alcohol consumption and determined that it was "not a mitigating circumstance that the Court can take into account" to justify an exceptional sentence downward. VRP (Jan. 11, 2021) at 18. Nissen argues that counsel could have "point[ed] out [that] drinking could still be a factor" in "determining the length of the exceptional upward sentence." PRP at 52. But it is unlikely that the trial court was unaware that it had discretion to do so. The trial court's comments on statutory mitigating factors and acknowledgement of Nissen's drinking suggest that the court was doing its due diligence to ensure there was no statutory basis for giving Nissen an exceptional downward sentence, but that it was not otherwise inclined to reduce the sentence length.

The absence of HA's counseling records does not change this analysis. If defense counsel neglected to seek out HA's counseling records, it is unlikely that choice prejudiced Nissen. Nissen has provided no evidence that HA's severe mental health problems were caused by anything other than his own conduct. Nissen also provides no evidence of what letters in his support would have said or any details about his military service or other possible mitigating information, let alone explain why that information would have caused the trial court to give him a lesser sentence. Nissen fails to show how exactly how he was prejudiced by counsel's failure to present mitigating evidence. Thus, Nissen's claim of ineffective assistance at sentencing fails.

III. DENIAL OF MOTION TO AMEND AND MOTION TO CONTINUE

Nissen next claims that the trial court abused its discretion when it denied the State's motion to amend the information to consolidate the new charges against Nissen and denied the defense's motion to continue trial. He argues that the trial court denied the motion based on a local

policy that "conflicts with the criminal rules." PRP at 26. He contends that the denial was "based on untenable reasons" because the motion was not made too close to trial and the amendment would not have prejudiced Nissen. PRP at 30 (boldface omitted). And he argues that the denials were improper because they were based on the trial court's bias against plea agreements, pointing to Judge Edwards' comments in the Daily World article accusing the Grays Harbor County Prosecutor of turning the office "into a plea-bargain factory." PRP at 33. Nissen contends that the trial court was required to grant the motions both to facilitate a plea bargain and to protect Nissen's right to effective counsel at trial.

Nissen cannot show that the trial court's denial of the motions prejudiced him at the plea negotiation stage. Nissen ultimately received and rejected a plea offer from the State that Nissen concedes "would have taken care of all the charges." App. at 20. Thus, he fails to demonstrate actual or substantial prejudice or a complete miscarriage of justice that would entitle him to relief.

Nissen also cannot show that the denial of these motions "created a situation where counsel would certainly be ineffective." PRP at 35 (boldface omitted) (citing *United States v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984)). In *Cronic*, the United States Supreme Court held that under certain rare circumstances, a defendant could show that they were constructively denied their Sixth Amendment right to counsel and therefore need not demonstrate prejudice from any specific conduct by counsel. 466 U.S. at 656-60. One circumstance that implicates *Cronic* occurs when "counsel, although competent, was put in a situation in which no attorney could provide effective representation." *See State v. Greatreaks*, 34 Wn. App. 2d 173, 180, 566 P.3d 886 (2025).

Nissen claims that "[c]ounsel's lack of preparation made it impossible 'that any lawyer, even a fully competent one, could provide effective assistance'" after the trial court denied the continuance. PRP at 35 (quoting *Cronic*, 466 U.S. at 659-60). But because Nissen does not explain why a fully competent lawyer would not have been prepared for the original trial date, he fails to show that he was constructively denied counsel under *Cronic*. We have already addressed above the root of this issue, counsel's preparation for trial. [8]

IV. CUMULATIVE ERROR

Nissen next argues that if we do not grant his petition on any of the previous errors, we should grant it on the basis that he was the victim of cumulative errors. The cumulative error doctrine is applied in "instances when there have been several trial errors that standing alone may not be sufficient to justify reversal but when combined may deny a defendant a fair trial." *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). Nissen alleges that all of the errors discussed above, as well as errors raised on direct appeal—counsel's failure to object to the voluntary intoxication instruction and failure to object to the detectives' opinion testimony regarding Nissen's guilt—combined to deny him a fair trial.

---

[8] Although the trial court's denial of these motions did not prejudice Nissen, it was improper under these circumstances. The first time a motion to amend the information came up before the trial court, the case was about six and a half months old and there were about three weeks remaining until trial. When the parties formally argued the motion to amend the information and the motion to continue, there were two weeks remaining until trial. In light of the fact that the State was entitled to amend the information absent an objection from defense counsel, and the *potential* impact on plea negotiations and defense counsel's ability to prepare, no reasonable trial court would have denied the motions. Although the trial court may have been concerned with judicial economy, global resolution of all of the charges against Nissen would have supported, not hindered, judicial economy.

We have found only one error at the trial stage, and the latter two errors Nissen raises were argued in his direct appeal, where we rejected a cumulative error claim. And although we acknowledge that counsel might have been deficient at sentencing, there are no other errors at the sentencing stage to compound that potential failure. We hold that cumulative errors did not deny Nissen a fair trial.

## V. DISPROPORTIONATE SENTENCE

Finally, Nissen claims that his sentence is cruel under article I, section 14 of the Washington Constitution because it is disproportionate to the offenses he committed. Nissen characterizes his sentence as an indeterminate 300-month sentence despite the fact that in this case, he was sentenced to a minimum of only 240 months. In its answer, the State mischaracterizes Nissen's constitutional argument as a claim that the exceptional sentence was "clearly excessive" under RCW 9.94A.585. State's Answer to Pet. at 22. It does not address the argument that the sentence was cruel punishment under article I, section 14.

"A sentence may . . . be cruel under article I, section 14 if it is grossly disproportionate to the offense." *State v. Moretti*, 193 Wn.2d 809, 830, 446 P.3d 609 (2019). "When conducting a proportionality analysis, we consider" four factors laid out in *State v. Fain*[9]: "'(1) the nature of the offense, (2) the legislative purpose behind the statute, (3) the punishment the defendant would have received in other jurisdictions, and (4) the punishment meted out for other offenses in the same jurisdiction.'" *Moretti*, 193 Wn.2d at 830 (internal quotation marks omitted) (quoting *State v. Witherspoon*, 180 Wn.2d 875, 887, 329 P.3d 888 (2014)).

---

[9] 94 Wn.2d 387, 617 P.2d 720 (1980).

Nissen attempts to address only the fourth *Fain* factor. Nissen points to a number of other sex crime convictions in Washington over the past four years and argues that his sentence is disproportionate compared to the sentences handed down in those cases. For instance, Nissen points to a case where the defendant "received 60 months for one count of first degree incest, two counts of third degree rape of a child, and one count of third degree child molestation" apparently to suggest that this case was similar to his but resulted in a much lower sentence. He points to another case where the defendant received 280 months for "four counts of rape of a child" with an "aggravating factor of an ongoing pattern of sexual abuse" for each count apparently to suggest that this case was more serious than his but resulted in a similar sentence. PRP at 67, 69.

This argument misunderstands how we apply the fourth *Fain* factor. To determine whether a punishment is disproportionate compared to other offenses in the same jurisdiction, we look not to specific sentences handed down to similarly situated defendants, but to what sentences are statutorily permitted for similar crimes. *See State v. Gimarelli*, 105 Wn. App. 370, 382, 20 P.3d 430 (2001) (comparing defendant's first degree child molestation two-strike sentence to the statutorily available two-strike sentences for "[o]ther most serious violent sex offenses" such as first degree rape, second degree rape, first degree rape of a child, and second degree rape of a child and finding it proportionate); *See also State v. Flores*, 114 Wn. App. 218, 224-25, 56 P.3d 622 (2002). Thus, Nissen fails to make any meaningful argument that his sentence is disproportionate, and therefore cruel.

In any case, it is worth noting that the first *Fain* factor clearly weighs against finding disproportionality. "Under the first [*Fain*] factor, we consider whether the crime is violent and whether it was committed against a person or property." *Flores*, 114 Wn. App. at 223. All three of

his convictions are classified by statute as "most serious offenses" and first degree child molestation and second degree rape of a child are classified as "violent offenses." *See* Former RCW 9A.44.083(2); Former RCW 9A.44.076(2); Former RCW 9.94A.030(33)(a), (d) (2019); Former RCW 9.94A.030(55)(a)(i) (2019). And all are crimes committed against a person rather than property. We hold that Nissen has failed to show his sentence is unconstitutional cruel punishment.

CONCLUSION

We deny Nissen's petition.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

GLASGOW, J.

We concur:

CRUSER, C.J.

CHE, J.